Campbell, Ohief Justice,
delivered the opinion of the court:
This case is before the court upon the facts. It has been decided that the amended petition- states a cause of action. Portsmouth Harbor Land & Hotel Company case, 260 U. S. 327. It is there stated that “ similar claims in respect of the same land based upon earlier acts of the Government have been made before and have been denied,” citing the Peabody case, 231 U. S. 530, and the Portsmouth Harbor Land & Hotel Company case, 250 U. S. 1. The earlier of these suits was brought in March, 1905; the next was brought in June, 1915; and the original petition in the present suit was filed in February, 1920. For convenience of reference they will be referred to as the first, second, and instant suits. While these first and second suits involved claims based upon earlier acts of the Government, it is to be noted that there is a difference of parties and that the land owned by any of the parties to the instant suit is very much less than that claimed to have been taken in the first suit. Notwithstanding the averments appear to include a claim for all of the land, it must ‘be confined to that part which is owned by a party or parties to the suit, and, as we show later, the claim is for a parcel of about 20 acres of upland on which at one time stood a hotel and in which only one of the parties plaintiff had any title or interest when the petition was filed. The hotel itself had been razed. It is to be noted also that the opinion of the Supreme Court on the question of the demurrer does not question or qualify either of the two earlier opinions. On the contrary, the controlling principles as announced in the first suit is quoted and approved, 260 U. S. 329. The two first suits must be taken as res adjudicóla upon the issues involved, and while it is said in the opinion by Mr. Justice Holmes (p. 330) that “ the fact that the evidence was not sufficient in 1905 does not show that it may not be sufficient in 1922,” and because of this condition the evidence adduced is to be considered in ascertaining its suffi *590 ciency to establish the case alleged, it is to be observed that generality of averment can not take the place of proof. There is proof of the firing of the guns in 1902, made the subject of the first suit, and of firings in 1914 stated in the second suit, and these, it has been decided, did not constitute a taking of plaintiffs’ property or the imposition of a servitude. But it is said that “the repetition of those acts through many years and the establishment of the fire control may be found to show an abiding purpose to fire when the United States sees fit, even if not frequently, or they may be explained as still only occasional torts.” Portsmouth Co. case, supra (p. 330).
What, then, is the new or additional evidence to establish the averments of the petition? By an amendment, filed after a demurrer had been sustained to the original petition, it is alleged that “ since the termination of hostilities and subsequent to the filing of the petition ” the United States “ have set up the said guns so as to fire over and across the land of said claimants, and have set the guns as aforesaid with the intention of firing and of pointing them as aforesaid over and across the land of the said claimants,” and further have in the use of said fort discharged all of said guns on or about the 8th day of December, 1920, “ over and across the said land.” The petition was filed February 10, 1920, the amendment was made in March, 1921, and the firing mentioned occurred in December, 1920. The facts establish that from the time of the bringing of the second suit in June, 1915, which complained of firings of the guns “ on or about November 23, 1914,” to the time of bringing the instant suit in 1920 not a gun had been fired at Fort Foster. Indeed, from the fall of 1911 until after the instant suit was brought there were no guns at Fort Foster to be fired, with the exception of two small-caliber guns at Battery Chapin, which have never been complained of, and, so far as that is concerned, are not shown to have ever been fired. The complaint in all the suits has been of 10-inch guns. These were dismounted in 1917 after the United States entered the World War and were removed to New York for shipment to France. They were not sent to France but were returned to Fort Foster in the latter part *591 of 1920. When the petition was filed they had not been remounted. Clearly there is nothing in this situation to sustain a right of action. But in December,, 1920, the guns having been remounted, were fired for the definite purpose of testing their installation. This firing was necessary and was done under the direction of officers of the Ordnance Department. Likewise, the firings of 1902, and again in 1914, were done by details under the direction of the Ordnance Department. Whether the guns were fired by one or another branch of the service can not justify a wrong, if any was committed, but the authorized firing and the purpose of it are facts to be considered when we come to determine the Government’s intention in the premises. The setting up of the guns, the adjustment of the carriages, the decision that they are in condition for use, and the making of necessary changes or repairs are duties devolving on the Ordnance Department. When this duty is discharged the guns are turned over to the Coast Artillery, which thereafter controls their firing or manipulation. Hence it was that in 1902, after the Ordnance Department had mounted the 10-inch guns, its officers directed them to be fired in order to determine their installation and suitableness. They were then turned over to the Coast Artillery. Again in 1914 some changes were necessary in the gun carriages. The Ordnance Department again took charge, made the alterations, and fired the guns to ascertain that the work had been efficiently done. This being found, the guns were again put in charge of the Coast Artillery.- In 1920, after it was decided to remount the guns at Fort Foster, from which they had been removed in 1917, as already stated, it again became the Ordnance Department’s duty to perform the work and put the battery in a condition of efficiency. That being done, the guns were transferred to the management and control of the Coast Artillery. They have at no time been fired by the Coast Artillery, in whose general charge they have always been, except in the instances stated, nor is there any proof or reasonable deduction to be drawn that this branch intends to fire the guns at all in times of peace. It has never done so. It can not be maintained that the Government may not establish coast defenses on its *592 own property. The remounting of the guns in 1920, notwithstanding their proximity to the land in question, does not give a right of action. Peabody case, 231 U. S. 530, 539. Firing them, as was done in December, 1920, under the conditions and for the purposes already stated, does not support an action any more than the firing in 1902 or1 that in 1914 gave a right to recover damages. To say that such guns may be installed, but may not be fired to test the machinery that manipulates or bears them, would be to defeat the very purpose for which coast defenses are erected.
It would seem, however, from the petition that the contention is that the guns, when discharged at all, must be fired over the land in question. Such is the plain implication of the averments, and certainly it is alleged that the guns were fired over this land in 1920. The proof does not sustain the latter allegation and fails to show the direction of the fire directed in 1920 by the officers of the Ordnance Department. Nor can the other contention be sustained. The guns can be fired entirely over and across Government property without impinging in the least on the land in question. This was pointed out by Judge Barney’s opinion in the first suit, Peabody case, 46 C. Cls. 39, 55. The line of division of the flats appurtenant to the 20-acre parcel and the Government reservation in accordance with the rule established by the Maine courts is shown on the map attached to the findings by the line A to F. The rule is thus stated by Judge Barney: “To divide flats between adjoining riparian proprietors, draw a base line from one corner, at high-water mark, of each lot to the other, and run a line from each end of this line at right angles to low-water mark. If, by reason of the curvature of the shore, the lines diverge or conflict with each other, the gain or loss is to be divided equally between adjoining lot owners by bisecting the angles made by ,the diverging or conflicting lines.” To sustain the rule there is cited Emerson v. Taylor, 9 Maine 42, and some other cases. After illustrating the rule by lines on map attached to the opinion, it continues: “ It will thus be seen that under this rule ,the Government is the proprietor of that part of the flats situated to the west of line A to F, which the findings show is sufficient territory over and across which *593 to fire ,the guns at Fort Foster for practice or any other purpose in time of peace.” The view thus expressed remains the view of this court. The plaintiffs have taken issue with it, maintaining that the rule of Emerson v. Taylor, supra, is not the correct rule, and saying in their brief that the case relied on “ has been long since overruled.” But it is proper to say that when the Government’s brief called attention to the reaffirmance of the doctrine of Emerson v. Taylor by the Supreme Judicial Court of Maine in the case of Portsmouth Harbor Land & Hotel Company v. Swift, 109 Maine 17, the plaintiffs’ counsel promptly withdrew their criticism of the earlier case. In this last-named case the Portsmouth Co. there named is the same company that is a plaintiff here, the flats in question in the case being flats appurtenant to a part of Gerrish Island, and the court said that “ the doctrine of Emerson v. Taylor has been the rule in this State for eighty years, and as it makes an equitable division of the flats in this case and as the running of the side lines of defendant’s upland straight overboard would work injustice between the owners by giving to the plaintiff more than its proportional part of the flats,” it was the opinion of the court that the rule of Emerson v. Taylor' applied. This being the case, there can be no question that the Government line over-the flats is' the line A to F on the map, as was said in the court’s opinion in the first suit decided in 1911. It leaves no question that the guns could be fired westward of the line A to F without impinging on the lands in question. That the firing in 1914 was across a small corner of the land was shown by the findings of fact in the second suit, as was also the fact that this occurred because the officer in charge was misinformed as to the lines and set a flag to mark the supposed correct line a little too far to the east. It was decided that the firing then done did not constitute a taking or- the imposition of a servitude, 250 U. S. 1. There being plenty of space for the firing of the guns entirely over and across Government property, it can not be accepted, especially in the absence of proof of the direction the guns were pointed, that they were fired over lands of any of the plaintiffs in 1920. To say the'-least of *594 it, the averment of the amended petition that the Government “ has discharged all of the said guns as aforesaid on or. about the 8th day of December, 1920, over and across the said land ” is not established by the evidence. Nor do the facts show or furnish a basis for inference that there is or ever has been any intention to fire the guns in times of peace, except for the unusual purposes for which .they have been fired, two of these occasions being when the guns were being mounted and the other occasion when the gun carriages were being altered. It would seem to be a serious defect in the system of coast defense^ that would erect machinery for disappearing guns, place the guns upon their carriages, and then leave them to be used when the enemy appears, without any sort of preliminary test of the sufficiency or efficiency of either, the machinery or guns.
Another basis of complaint is the alleged use of the land “ for the establishment of a fire-control station and service for the use of said fort.” It is said in the opinion of the Supreme Court (p. 330) that “ the establishment of a fire control is an indication of an abiding purpose ” to utilize the lands at will. It becomes important, therefore, to examine the facts as to the fire-contro) station. There was no fire-control station at Fort Foster prior to the war. There was none there when this su.it was brought. There is none there now. What was done relative to the establishment of a fire control was largely developed in the testimony taken in the second suit. It was evidently not deemed of such serious import at that time because it was not made by plaintiffs the basis of a request for a finding of fact in the second suit. The plaint.iffs asked for a finding that “ the fort was maintained in a condition of readiness, except for the fact that no fire-control system was installed.”
An officer who devised the plan for a fire control in 1917, after the United States entered the war, and who put his plan into execution, was examined as a witness in 1917 and stated positively that the plan was for a fire control at Fort Stark and not for Fort Foster. It may pertinently be asked what purpose cou)d be subserved by setting up a fire-control station at Fort Foster when the guns had been removed. *595 There was and is a battery of large 12-inch guns at Fort Stark commanding the entrance to Portsmouth Harbor. Fort Stark is on the New Hampshire side of the Piscataqua Uiver and about one and a half miles southwest of Fort Foster, which is on the Maine side of the river. It has a plotting room and the mechanical and necessary appliances of a.complete fire-control station. To be effective as a fire-control station it is necessary to connect the fort with outside points from which the desired information as to the location of the enemy vessel or target can be obtained. The plan to accomplish this for Fort Stark was explained by the officer stating that two suitable points on Gerrish Island were selected, one at or near the shore line on the east side of the island and the other south and near the site of the hotel. These were observation points, connected by what is called the base line, the distance being carefully measured. At the eastern extremity of this base line was built a small concrete affair for housing the detail charged with the duty of keeping careful outlook. A cruder structure was used by the detail with like duty at the western extremity of the base line. The eastern station was called the primary station and the other the secondary station. Not only was the distance between the two, the base line, known to each, but there had to be a means of quick communication between them, and hence a cable or wire connection was made and telephones installed.
Let it be supposed that a vessel is seen approaching. The fact is communicated by the one observation station to the other and each of them takes the line of direction from its end of the base line across the supposed vessel. Knowing the exact length of the base line and the size of the angle made at each end by the line projected from the end of the base line across the object, the distance between the several stations and the object is readily ascertained by a method of triangulation, and thus the position of the vessel is accurately found, it being located at the point of intersection of the two lines projected from the ends of the base line. But what is needed is to get this information to the central station where the guns are to be fired at the object-sup *596 posedly an enemy vessej. Hence it was that a cable with wires was constructed from both the primary and the secondary station and carried to Fort Foster, where there already was established a cable connection with Fort Stark, the central station, where the guns were located. Each of the two observation stations communicate by telephone with this central station. The latter has the length of the base line and is given the angle made between ,it and the line projected on the object, and with these data readily fixes the position and distance, using appliances made for the purpose in connection with its plotting board. By using the cable connection, already existing between Forts Foster and Stark, the necessity of another cable across the P.iscataqua River to connect the latter with the primary and secondary stations was obviated.
Before constructing any observation points the officer in charge sought the consent of known property owners to the temporary occupation. It does not definitely appear that any owner of the 20-acre parcel was asked or consented. The Saco & Biddeforcl Savings Institution, as the owner in possession of the 155 acres, gave express consent for any use of the property found necessary during the period of the war. M.iss Belle H. McClure, the owner of a lot near the Government reservation on which the cable connecting the primary station at Cedar Point with Fort Foster would probably pass, cordially assented to the use of her property, and not having a reply from the authorities she properly insisted upon and received an official acknowledgment of her willingness that her property could be used by the Government during the war. That there was no purpose to disregard private rights may be assumed from the fact that the authorization for the establishment of the fire-control station and its accessories stated that the consent of property owners had been obtained, but as we have said, it does not appear that the use of any part of the 20-acre tract was authorized, nor does it appear that any objection was made to the use. A small detail of men was kept at the two stations until hostilities ceased and was then removed, together with the telephones and other appliances. The stations were then *597 abandoned. There was also erected during the war on a knoll near the hotel a small improvised structure for a searchlight, but no light was ever installed and no use was made of the structure. In the absence of permission to thus use the property, a tort would be committed, but it was not a taking of the land.
Notwithstanding the decisions in the two cases, the plaintiffs contend that the property was taken in 1902, and upon their brief say, “ The date of the alleged taking is 1902; due compensation includes the ordinary increase in value of the property to 1926. The mortgagees are entitled to their proper adjustment, but the United States took the property in 1902, though the action only accrued upon the manifestation of intention in 1920.” This contention has no basis of support, in the op,inion of the Supreme Court. If the taking was, as is contended, in 1902, the claim is clearly barred by the statute of limitations, which is jurisdictional. See Wardwell case, 172 U. S. 52. And if the property was taken in 1902, it is difficult to understand how there can be a claim for “ lost profits for 24 years at $10,000 per year,” or how that fact can give a right to claim an increase of value in 1920 of nearly double the value in 1902. Indeed, it is difficult to follow the reasoning that the existence of the fort and the handling of its guns so thoroughly destroyed or injured the beneficial use of the property when it is contended that during the period involved it so largely increased in value. But, as already said, there was no talking of the land or imposition of a servitude thereon either in 1902 or 1915, and the facts do not warrant a different conclusion in the instant suit.
Reference has been made to the question of ownership. The facts show that the Saco & Biddeford Savings Institution is the owner of 155 acres of the land, the taking of which was claimed in the first suit. That concern was not a party to the second suit, though it was the then owner of the 155 acres. It is not a party to the instant suit. The balance of the land, originally made the subject of claim, consists of about 20 acres of upland with some appurtenant flats. The hotel mentioned in the findings was located on this 20 acres. *598 It had been razed before this suit was brought. The facts show Caroline E. Peabody to be the owner of the 20-acre parcel under foreclosure proceedings under a mortgage of which she was assignee. The other parties plaintiff are not shown to have any title to or interest in the property. Clearly there can not be a recovery by the real plaintiff for anything occurring before she became owner. The petition prays that the court exercise certain equitable jurisdiction by reviewing and setting aside the findings of fact made in the second suit, and also that it “ restrain the use of the fort.” The Court of Claims has no such jurisdiction. Its powers as a court of equity are limited and it has no authority to issue a restraining order. See Jones case, 131 U. S. 1, 18; Milliken Imprinting Co. case, 202 U. S. 168; Leather & Leigh case, 61 C. Cls. 388; Jackson case, 21 C. Cls. 14, 85. The second suit, long before the present' suit was brought, had passed out of the jurisdiction of the court under the applicable rules of law as well as the rules of court, and even if the facts presented would sustain in a court of equity a bill of review or an original bill in the nature of a bill of review, which it seems to us they signally fail to do, this court could not afford relief. See Kingsbury v. Buckner, 134 U. S. 650, 611. We think that the reason for closing the hotel in 1904 after the firings of the guns in 1902 and not reopening it, even though no gun was fired thereafter until 1914, is to be ascribed to other causes .than the proximity of the fort or the firing of its guns. The hotel probably lacked conveniences as well as attractions. However, in the instant suit, as in the two earlier suits, there is a failure of proof that any agent of the Government was authorized to take the land in question or impose any servitude upon it. There is an absence of proof that the Government or its authorized agents ever had or now have an intention of firing over any of this property in time of peace. There is a want of proof to sustain the essential averments of the petition as amended.
Our conclusion is that the petition should be dismissed. And it is so ordered.
Moss, Judge; Graham, Judge; and Booth, Judge, concur.