NATIONAL DOCK & STORAGE WAREHOUSE CO. v. UNITED STATES.

GARDINER et al. v. UNITED STATES.

Nos. 47725, 47726.

United States Court of Claims.

June 5, 1951.

---

George A. McLaughlin, Boston, Mass., for the plaintiffs.

Thomas L. McKevitt, Washington, D. C., A. Devitt Vanech, Asst. Atty. Gen., for the defendant.

LITTLETON, Judge.

Plaintiffs in these combined cases are the owners and lessee of waterfront property in the city of Boston, Massachusetts, known as the "North Pier" and more particularly described in finding 2. The National Dock Trust (whose trustees, William Tudor Gardiner and George A. McLaughlin, are plaintiffs in Case No. 47726) is a Massachusetts "business trust," and the National Dock Storage Warehouse Company (plaintiff in Case No. 47725) is the Trust's wholly-owned corporate subsidiary, leasing from the Trust, conducting a warehousing business on the property, and paying as rental its entire profits. Both suits arise from an alleged "taking" of plaintiff's North Pier property by the United States Navy. There is a single cause of action. Hereinafter, plaintiffs will be referred to collectively as plaintiff or "National Dock."

Shortly after the outbreak of war in December 1941, the United States Coast Guard undertook to safeguard port facilities by the inauguration of armed "port security" patrols and the restriction of access to vital areas to identified holders of Coast Guard passes. Plaintiff's property, in common with all other similarly situated waterfront property, was subjected to such patrol and restriction.

In May 1942, negotiations were begun between officers of the United States Navy and National Dock's manager, looking toward the Navy's lease of four wooden warehouse buildings, built partly over water and known as Buildings 30 (division 3), 31, 32, and 33, together with the adjacent wharf apron and wet slip. Together, these properties comprised National Dock's "North Pier." Oral negotiations and an inspection of the premises by officers from the Navy's nearby Lockwood Basin installation were followed, on May 29, 1942, by a letter (finding 5) from National Dock to the Navy, offering for the Navy's "consideration" the North Pier property at a monthly rental of $2,600. Further negotiations followed and on June 23, 1942, the Chief of Staff of the First Naval District advised plaintiff by letter (finding 6) that the "Navy Department had approved the rental of North Pier, East Boston, Mass." This was merely an authorization. No rental agreement had been reached. Relying upon this letter as an expression of intent, the plaintiff removed from the pier buildings some 25 bales of wool then stored therein, and the Navy Section Base sent a small work crew of Navy men to the North Pier to clean out the buildings for the Navy's possible occupancy.

It developed, however, as negotiations proceeded, that the Navy and National Dock could not agree upon a rental price, and the Navy withdrew its working party after two days, having merely cleaned the premises. No agreement or lease for the use of the property was entered into. On July 2, 1942, National Dock advised the Navy by letter (finding 10), that plaintiff stood upon the terms of its original offer and that it would be impossible for National Dock to "continue any arrangement for keeping the premises open and available to the Navy Department beyond July 10th, [1942]." The Navy replied to this letter under date of July 17, 1942 (finding 11), advising plaintiff that the Navy had decided against leasing the property because it did not feel the rental requested could be justified and informing plaintiff that the Navy would proceed to occupy the property by condemnation. Upon receipt of this letter,

plaintiff took the position that a contract already existed by virtue of the Navy's letter of June 23, 1942 (see finding 12), and held to this position until the institution of this suit, when it was abandoned in favor of a theory of "taking." Claiming that the Navy had been in possession as lessee from June 10, 1942, National Dock billed the Navy monthly for the occupation of the North Pier, indicating in connection with the September 1942 bill that plaintiff would be happy to accept "surrender" of the space should the Navy so desire. None of these bills was paid.

As the Navy moved to condemn, plaintiff's manager suggested to Navy officials that certain other brick and tile buildings adjacent to the above-mentioned wooden buildings might be more suitable for the Navy's purposes, while retention of the wooden buildings would be more advantageous to National Dock. The Navy adopted this suggestion, made the substitution in its condemnation papers and, on November 18, 1942, entered into possession of the brick and tile buildings (described in finding 2, et seq., as Buildings 54 and 75) and the wharf and wet slip of the North Pier under formal condemnation procedure. Buildings 30 (division 3), 31, 32, and 33, were not included in the condemnation.

Plaintiff has abandoned, and we think properly so, the theory that a contract arose from the correspondence set forth in findings 5, 6, 7, 10, 11, and 12. That correspondence indicates only preliminary negotiations looking toward a lease which never materialized due to inability to agree upon a rental price. If any obligation to pay rental for plaintiff's pier is to be found, it must be on the theory of a "taking" of private property for public use, for which the Fifth Amendment to the Constitution guarantees just compensation.

National Dock's main reliance is upon certain alleged acts of the Navy, which plaintiff contends amount to a taking of its property for public use. Plaintiff contends that, commencing June 10, 1942, the Navy excluded plaintiff from its North Pier property and used that property for Navy purposes, thus giving rise to the Government's

obligation to pay just compensation measured by the standard of a reasonable rental. The law is well settled that when the Government, in the exercise of its power of eminent domain, excludes the owner of private property from the use and enjoyment thereof, there is a compensable "taking." Atwater v. United States, 106 Ct.Cl. 196. A leasehold may be "taken" as well as a fee, United States v. General Motors Corp., 323 U.S. 373, 65 S.Ct. 357, 89 L.Ed. 311, and the United States may create, by the act of taking, a leasehold that did not exist before, with itself as lessee, Atwater v. United States, supra, 106 Ct.Cl. at page 206, citing Johnson v. United States, 2 Ct. Cl. 391; 8 Ct. Cl. 243.

The defendant admits that plaintiff's wet slip and wharf apron adjacent to the buildings in question were used by the Navy to the exclusion of plaintiff between June 20, 1942, and November 18, 1942. But this did not interfere with plaintiff's use of the buildings. We have found that, actually, such use by defendant commenced June 17, 1942, and continued without the payment of compensation until November 18, 1942, and that the reasonable value of such use was $2,500. On November 18, 1942, the wet slip and wharf apron along with Buildings 54 and 75, above mentioned, were formally condemned for Navy use, and, thereafter, payment was made to National Dock in accordance with a court order.

It is about Buildings 30 (division 3), 31, 32, and 33, that the dispute is sharpest. National Dock alleges that it was excluded from this warehouse property as well as from its wharf and wet slip by the Navy's use thereof. The Government contends that the Navy neither used nor excluded plaintiff from using Buildings 30 (division 3), 31, 32, and 33, until December 14, 1943, on which date these four buildings were occupied, in addition to Buildings 54 and 75, under formal condemnation procedure. Plaintiff has the burden of proof and to prevail must establish by a preponderance of the evidence that the Navy excluded the plaintiff from the buildings and either used them for Navy purposes or kept the plaintiff from using them for its own purposes.

■ Between May 29 and July 17, 1942, plaintiff and defendant were negotiating for a lease agreement. Both parties thought that a rental agreement would be consummated. Plaintiff moved out the small quantity of wool then stored in the buildings and the Navy sent in a work party to clean up. Removing the wool no more indicated a completed lease than would a landlord's painting of an apartment in anticipation of a new tenant. If the expected lease does not materialize, the prospective tenant who terminates negotiations before a firm agreement is reached is not liable. Such a loss to the landlord is a normal incident of doing business. The Navy's cleaning of the premises was with plaintiff's permission and done at a time when both parties contemplated Navy occupation, under a lease agreement, at an early date. After July 17, 1942, plaintiff had written notice that no lease would be made. National Dock was in exactly the same position as any disappointed seller upon failure of negotiations for sale or rental.

Until the buildings were formally condemned, plaintiff could have done anything it pleased with the space in Buildings 30 (division 3), 31, 32, and 33. We find no convincing evidence of any exclusion of plaintiff's agents or employees. Plaintiff's appraiser entered the property; plaintiff's roofer inspected the premises periodically; plaintiff's guards patrolled the entire area, kept a daily log of activities, and at one time evidenced their authority over the premises by ordering a Navy sentry to put out a fire he had built to warm himself. Plaintiff's representative was stopped at one time by an armed guard; but he was allowed to proceed immediately upon the production of proper identification. The requirement of identification in waterfront areas was a normal port security function and a proper exercise of the Government's police power not inconsistent with National Dock's rights of ownership.

Plaintiff did not produce a witness who was able to give any definite indication of Navy use of the premises during the time in question except that water hoses were stretched through Building 30 (division 3) and that trucks, in order to service naval vessels at the pier, sometimes passed through plaintiff's buildings. The evidence as to trucks passing through one of the buildings is conflicting. Plaintiff offered no evidence of any attempt of their own to use the buildings. There was no attempt to mitigate damages by a use of the buildings after having been advised on July 17, 1942, that the Navy did not intend to lease, nor even when the Navy omitted the wooden buildings from the condemnation proceedings of November 18, 1942. Rather, the correspondence between the parties indicates that National Dock was more anxious to develop the theory of a contract based upon the Navy's letter of June 23, 1942, than to put the premises to any use of its own. The original use of water from Building 30 (division 3) was permissive, and there is no evidence that this permission was ever revoked or that the Navy's hose interfered with the use of the building by plaintiff. There is no evidence that the passage of trucks through the warehouses was more than occasional or that they could not or would not have taken a different route had they been requested. There is ample evidence in the record to sustain the finding that access to the North Pier wharf was available without driving through the warehouses.

■ If this were an action in trespass between private parties, the evidence might be sufficient to sustain plaintiff's case, but we hold that the plaintiff has failed to prove acts amounting to a taking of its property for public use. Occasional acts of trespass, not part of a continuing plan or intent to use, do not constitute a "taking," Portsmouth Harbor Land & Hotel Company v. United States, 260 U.S. 327, 43 S.Ct. 135, 67 L.Ed. 287, and, on remand, 64 Ct.Cl. 572, and none of the cases cited by plaintiff so hold. Plaintiff has failed to prove an actual use of Buildings 30 (division 3), 31, 32, and 33, by the United States or the exercise of dominion thereover during the period in question, to the exclusion of the plaintiff, and we conclude that its claim based on such an alleged use is without merit.

■ The National Dock Trust was the owner and lessor of the buildings in ques-

tion and the wet slip and wharf apron adjacent thereto. The National Dock and Storage Warehouse Company was the lessee and operator of these properties. This company, as such lessee, is therefore entitled, as lessee, to the compensation which the defendant admits to be due for the taking and use by it of the wet slip and wharf during the period of such use, that is, June 17 to November 18, 1942. The petition in case No. 47726, William Tudor Gardiner and George A. McLaughlin, Trustees of the National Dock Trust, is dismissed, and judgment in case No. 47725 is entered in favor of the National Dock and Storage Warehouse Company in the sum of $2,500, together with an additional amount, as a part of just compensation, measured by interest at 4 percent per annum on such sum from June 17, 1942, until paid. It is so ordered.

JONES, Chief Judge, and HOWELL, MADDEN, and WHITAKER, Judges, concur.