Nichols, Judge,
delivered the opinion of the court:
Plaintiffs sue under the Tucker Act, 28 U.S.C. § 1491, for just compensation for the constitutional taking of their residential lakeside property for public use by so-called "inverse condemnation” resulting from the Government’s operation of Lake Eufaula Dam and Reservoir in Oklahoma. The plaintiffs prevail.
The case was tried before Trial Judge Bernhardt, who submitted an able recommended opinion and findings of fact under Rule 134(h). We are much aided by his analysis. We agree with his conclusion and much of his reasons, but differ with several statements, and, therefore, we prefer to state our legal conclusions in our own terms.
In 1964 the Army Corps of Engineers completed the Eufaula Dam on the Canadian River, a tributary of the Arkansas River, as part of a 22-dam project affecting the entire Arkansas River Basin, to achieve purposes relating to navigation, electric power, and flood control. The filling of the reservoir behind the dam attracted numerous real estate shoreline subdivisions, of which Coon Creek Acres Addition was one, developed by James McGill.
In 1967 the plaintiffs purchased Lot 36 in scenic Coon Creek Acres. In 1970 they purchased adjoining Lot 35. The lots occupy the tip of a south shore promontory overlooking to the north a some 3-mile width of the reservoir. Although the lots were subject to certain covenants pertaining to single-family residential use and minimum floor areas, plus other express restrictions, no restriction was stated as to the minimum elevations permitted for residential improvements. However, there was an unenforceable oral understanding between Mr. McGill and the Stocktons at the time of purchase that no habitations should be built below the elevation of 602 feet mean sea level, supposedly *511 representing the potential maximum flood level imposed by the dam top elevation of 597 feet.
Plaintiffs’ lots were separated from the water’s edge by a narrow irregular strip of land which had been acquired in fee by the Government for flooding purposes. While most of Lot 36 lay above 602 feet, a portion sloping toward the shoreline lay below 597 feet. The contour maps used in the original Government acquisition had been in error. The boundary of the fee acquired did not follow any specific contour line because it was not laid out that way, but along a series of straight or "blocked out” lines. The filling of the reservoir to the maximum elevation the height of the dam would permit, would submerge when the water remained smooth only up to 597 feet elevation, covering a small amount of plaintiffs’ land over which defendant enjoyed no rights. The reservoir elevation was controlled by the Tulsa District of the Corps. At the time plaintiffs purchased Lot 36 in 1967, the elevation had never exceeded 585 feet.
In 1967 or 1968 plaintiffs built on Lot 36 a house whose lowest elevation was just above 602 feet. A septic tank was embedded in the slope below 602 feet between the house and the Government’s thin strip of land fringing the shore.
Fluctuating levels of the reservoir at times temporarily submerged grass and trees on the slope, but with no ill effects. In late 1970 higher water levels coupled with wind-driven waves eroded a small scarp on the water edge of the Government’s strip of land separating plaintiffs’ Lot 35 from the reservoir. This was the first visible indication to plaintiffs of erosion prospects. Theretofore a number of marooned dead trees standing offshore may have helped to ameliorate the force of the waves, but as they rotted away and disappeared, the shoreline caught the unbroken brunt of wave action. Fearful of erosion affecting their own property, the plaintiffs requested the Corps to take corrective action. The Corps declined, but gave plaintiffs permission to install protective riprap on the slope, which means the layering of rocks of progressively increasing sizes on the bank to hard hold the soil and curb erosion. Riprapping is costly. Instead, plaintiffs installed iron posts, metal sheeting, and sand along the bank which proved ineffective and were soon washed away by the waves.
*512 In 1966 the Corps had discovered certain surveying errors governing their original land acquisitions for the reservoir, one such error at Coon Creek Acres being the failure to acquire flowage easements to forestall future flooding claims. The Corps’ misgiving were not communicated to lot purchasers. In 1971, the Corps proposed to plaintiffs and other property owners at Coon Creek Acres that they grant to the Government by amended deeds of dedication the right intermittently to overflow and submerge their properties up to 602 feet. The letter sent to plaintiffs making this proposal, which for some undisclosed reason specified Lot 36 but not Lot 35, stated that the proposed grant of a flowage easement would give the Government no estate it did not already possess, since (said the Corps) the restriction proposed was identical to that already agreed upon between plaintiffs and McGill in their purchase transaction. It will be recalled that there was merely an oral understanding rather than an enforceable covenant that no habitations would be built below 602 feet. The Corps told plaintiffs that any questions they might have concerning the proposal could be addressed to either a Corps employee or to McGill, who for this limited purpose seemed to be acting as a de facto agent for the Government.
The trial judge at the start of the trial excluded a portion of a letter by Mr. Benjamin Davis, Corps of Engineers to Mr. Stockton, dated February 10, 1971, which portion read:
It is pointed out to you and emphasized that no estate of any kind is being acquired from you by this instrument. It imposes no additional restrictions or reservations than those already agreed upon between you and the Developer, Mr. Jim McGill. The deed of dedication merely confirms the restriction that you and your successors will not construct or maintain any structure for human habitation below elevation 602.0 feet mean sea level.
The ground of exclusion was that this part of the letter stated the writer’s conclusion of law. In saying as he did that the Government acquired its flowage easement by a subterfuge, and in his finding 10, the trial judge obviously relied on this excluded language, but by some inadvertance the exclusion was not formally corrected. During trial, the *513 language was frequently referred to as being in evidence, e.g. Tr. 271. As the ultimate trier of fact in cases in this court, we correct the record to reflect that the entire letter is admitted without any omission. On the date of the trial the new Federal Rules of Evidence, Pub.L. 93-595, 88 Stat. 1926, had just come into effect and by Rule 402, all relevant evidence is admissible unless excluded by express provision of law, or the rules themselves. We find the entire letter relevant, and the mere fact that the involved paragraph purported to state a conclusion of law was not, per se, a ground of exclusion that was saved. It is not admitted to prove the correctness of the writer’s conclusion. It is quite obvious that the conclusion was incorrect, since, as will more fully appear, an easement to flood intermittently has other consequences than to inhibit the erection of buildings. Defendant, while relying on the exclusion, also alternatively briefs the matter on the hypothesis that the full letter is before the court; thus it is not unfairly prejudiced by the belated nature of this record correction.
On the advice and persuasion of Mr. McGill, and his assurance that no damage would result to their property from reservoir flooding, plaintiffs executed the document in February 1971, as a virtual gratuity. McGill had informed them, correctly so far as the record shows, that if the Government had to purchase or condemn, it would bar plaintiffs from the shoreline or at least require express official permission for any structure below 602 feet, even if not intended for habitation. We do not see these factors as substantial consideration.
Heavy rains in April 1973 consistently brought reservoir elevations to over 592 feet throughout the month, peaking at 596.91 feet. These unprecedented levels, coupled with strong northerly winds, sent 3 to 4-foot waves against plaintiffs’ shoreline, eroded the soil on Lot 36, and toppled trees into the lake. As the strip of shoreline owned by the Government was destroyed and the waves attacked the plaintiffs’ land, the theretofore gentle slope of Lot 36 was cut back and radically steepened. The Corps refused plaintiffs’ demand for help, contending that the flowage easement it had obtained from them in February 1971 by *514 the deed of dedication relieved the Government of any liability for the consequences of water levels below 602 feet. In 1974 plaintiffs inexpertly riprapped their remaining shoreline at their own expense, but this was not a professional job and was only partially effective. By the time of trial in 1975, the plaintiffs’ house was perilously close to the brink of an eroded cliff, its foundation deprived of lateral support. Erosion of unconsolidated soils (sand) such as found at plaintiffs’ property feeds upon itself, so that now at even low reservoir levels the water penetrates and weakens the support for the eroded cliff, causing an acceleration of the process, particularly when coupled with waves. Surface runoff over plaintiffs’ lot carves furrows into the eroded face of the cliff, hastening its crumbling. In the absence of' corrective measures the house itself is doomed as the erosion inexorably progresses.
The trial judge, with the consent of counsel and accompanied by them, took a view. His conclusions as to the condition of the premises on the date of trial, therefore, are difficult for defendant to attack in any persuasive fashion. He might have remembered the lines of the once popular poetess:
Safe upon the solid rock
The ugly houses stand
Come and see my shining castle
Built upon the sand.
Familiar legal principles compel the conclusion that plaintiffs under these conditions are entitled to compensation for the taking of their property. A taking under the fifth amendment occurs when the Government acts in a manner that directly interferes with or disturbs a claimant’s rights in his private property. Widen v. United States, 174 Ct. Cl. 1020, 1027, 357 F.2d 988, 993 (1966), citing United States v. Cress, 243 U.S. 316 (1917), and others. Formal acquisition of title by the Government is not prerequisite to a taking where appropriation or destruction of property results directly from Government actions. Widen v. United States, supra at 1027-28, 357 F.2d at 993.
*515 The Government consistently has been required to compensate owners whose property, due to sovereign waterway improvements, has become permanently liable to "intermittent but inevitably recurring overflows.” United States v. Cress, supra, at 328. Given causal proximity between the Governmental action and damage suffered, liability has been found in the instance of overflows (United States v. Cress, supra), underflows (United States v. Kansas City Life Ins. Co., 339 U.S. 799 (1950)), raised water table destroying agricultural property by saturation and erosion (United States v. Dickinson, 331 U.S. 745, 750 (1947)), and also where saturation destroyed agricultural property (Barnes v. United States, 210 Ct. Cl. 467, 538 F.2d 865 (1976)). The character of the invasion rather than the amount of damage determines compensability, so long as the damage is substantial. United States v. Cress, supra, at 328.
We will assume, at least for the purposes of this case, that under normal conditions the Government’s acquisition of a flowage easement up to 602 feet would not carry with it any warranty that the water would always be smooth. If the impounded water were wide enough for waves to build up, and if the land were easily erodible, it would be up to the owner to exact compensation for the added exposure, or else to protect himself by riprapping or other engineering measures. Referring to the Davis letter, defendant denies it is bound to a different result by an erroneous interpretation of law by a subordinate employee. Granting this to be generally true, here it is attempting to bind someone else. It is not estopped by a representation by an officer lacking authority to act. United States v. State of Florida, 482 F.2d 205, 209 (5th Cir. 1973). When it is merely a question of construing a deed, when the object is to discover the grantor’s intent and to ascertain whether the words he subscribed have their normal meaning, we do not think a question of estopping the Government is raised. And here, the effect of a decision for plaintiffs is not to impair the flowage easement, but to prevent the Government from avoiding paying for it, by a gratuitous conveyance induced by the misrepresentation of its ostensible agent. If in this case defendant was knowingly taking advantage of a *516 misrepresentation by an outside third party that led plaintiff to misconstrue his grant, the effect would be the same. Thus, the debate by the parties whether Messrs. Davis and McGill were designated agents of the Government who could bind it, we think is beside the point.
We have long applied equitable doctrines in actions at law in this court, to the extent of rescinding or reforming Government contracts obtained by overreaching the private contracting party, as for example, by taking advantage of a mistake, which originated with the other party, but should have been obvious to the Government official. Chernick v. United States, 178 Ct. Cl. 498, 372 F.2d 492 (1967); Dynalectron Corp. v. United States, 207 Ct. Cl. 349, 518 F.2d 594 (1975). A deed relating to real estate is obviously in a class by itself, but there is authority that in case of a gratuitous conveyance, the intent of the grantor governs, and this should be all the more true when the grantee contributes to the mistake.
The Restatement, Property § 483(b) (1944) says
g. Standard for gratuitous conveyances. In a gratuitous conveyance, the applicable standard is that of the conveyor; hence, the background of interpretation in such a conveyance is his background. The interpreter of a gratuitous conveyance is permitted and required, in an attempt to ascertain its meaning, to take account of the meaning it had to the conveyor insofar as that can be ascertained without contravening applicable rules of evidence such as the rule forbidding taking into consideration direct statements of his intention made by him outside of the conveyance * * *. The interpreter must also take account of knowledge and usages peculiar to the conveyor, and of his special skill or training or his lack thereof.
See also, Powell On Real Property, p. 504, para. 415 (1975 ed.)
In a negotiation relating to land, one making a transfer for valuable consideration would not be warranted or protected in taking his law from statements on the other side of the bargaining table. Mills v. United States, 187 Ct. Cl. 696, 410 F.2d 1255 (1969). But, one who makes a gratuitous transfer may, if he is legally unlettered as the plaintiffs here, and if his construction is not wholly unreasonable, impart to his grant the meaning the other *517 side has attached to it and told him it would have. Even if Davis had no authority to write the letter, he ostensibly spoke for the Government, and the Government has the letter in its files and retains its fruits. It knew, or should have known, that plaintiffs would rely on it, and would think the grant meant what Davis said it meant. Therefore, by reformation or operation of the rules of construction the grant did mean what Davis said it meant, or else is reformed to so mean. Recording systems might protect subsequent transferees for value who did not know the circumstances, but we do not confront that problem here.
Mills v. United States, supra, not cited by the parties herein, is of interest as the opposite side of the coin we consider here. In that case, an elderly lady, since deceased, had transferred to defendant land, including a valuable gravel pit, for a money consideration her heirs said was inadequate. As a showing to nullify the deed, they relied on her age, limited education, lack of legal counsel, and various alleged misrepresentations by defendant’s agent. We held an issue of fact for trial was not presented as none of plaintiffs contentions, if true, would warrant cancellation of the deed. One of the misrepresentations was as to the law; they allegedly said she was not legally entitled to compensation for the gravel pit. We stated at 187 Ct. Cl. at 700, 410 F.2d at 1257
* * * In the absence of unusual circumstances, [emphasis supplied] representations as to questions of law form no basis for setting aside a contract. * * * Ordinarily one having need of legal advice will retain counsel and not take it from the other side of the negotiating table. Purchase and sale of real estate [emphasis supplied] is a kind of transaction where retention of counsel is ordinary and usual. The relationship of the parties was not such that it was reasonable for one side to have relied on the representations of the other.
But we rejected defendant’s argument that plaintiffs could recover only if they could prove the lady was incompetent, referring to instances of
* * * recision or reformation in cases of overreaching by contracting officers, taking advantage of a vendor’s obvious mistake.
*518 citing Chernick, supra, 187 Ct. Cl. at 698, 410 F.2d at 1257. It is clear that the circumstances we have in the case before us now might be deemed unusual and the subject of negotiation was a gratuitous transfer, not a purchase and sale. These matters distinguish the Mills case and indicate a contrary result, for which the Mills opinion was carefully written to leave open the possibility.
We cited and followed Mills in Collins v. United States, 209 Ct. Cl. 413, 532 F.2d 1344 (1976) stressing that the taxpayer there involved, alleging a misrepresentation of law by an IRS agent, had his own tax counsel.
Accordingly, the conveyance of the flowage easement means or is reformed to mean what the Davis letter said it meant. It means that the only effect of the Stockton’s grant is that they may not build human habitation on the land below the 602 foot contour line. However, Mr. Stockton’s testimony shows that he also anticipated some flooding but without injurious consequences, "intermittent flooding which would back the water up, which won’t hurt your property at all * * *.” Tr. 15. Thus, any right to flood may be deemed associated with a warranty against wave damage. This is an interpretation which a legally unlettered person could give the bare language of the grant, and which has been seriously urged by legally well-instructed persons concerned in trying this claim, but we could not urge it as a proper construction of a flowage easement except in the peculiar circumstances of this case. Wind and water being what they are, we do not see how the Government could fulfill its warranty and thus it really derives no protection at all against liability from the grant of the flowage easement. We proceed to consider the Government’s liability to the Stocktons as if no grant had been made. Only if the waters had stayed smooth and retreated without inflicting harm, would the easement be of any avail, a situation contrary to fact and moot.
We further conclude that defendant has taken a small portion of plaintiffs’ land, that below the 597 foot contour but not included in the Government’s previous fee acquisition. We further believe that only one actual flooding is enough when the property is upstream of the dam and below the contour line to which the dam is designed to *519 impound water. Then, even if there has been but one flooding, the result is only that which the engineers intended the dam to achieve. Cases saying that "one flooding does not constitute a taking,” Hartwig v. United States, 202 Ct. Cl. 801, 809, 485 F.2d 615, 619-20 (1973) and cases therein cited, are cases where the property flooded is downstream of the dam and the damage is an unintended and unwanted result of changes effected by the dam in the downstream flow or consequential and indirect upstream flooding. Cases such as we have here do not often occur because the engineers do not often fail, as here, to acquire all the land below the contour line of the designed and intended pool. In this case the level of 596.91 feet is the record water height and was reached only once, April 25, 1973, but was "approximated” twice later, once in late 1973 and again in late 1974. Defendant admits that in the future the 597 foot level will be reached on an average once every eight years. Defendant’s analysis of the legalities of the situation is fatally flawed by the fact that it assumes it had previously acquired a full flowage easement up to 597 feet.
Having taken a small but substantial part of plaintiffs’ land, that below 597 feet, defendant is liable for injury to the value of the remainder caused by its use of the land taken. This is elementary eminent domain law. 4A Nichols, Eminent domain, Rev. 3d Ed. 1976 § 14.23. The taking date is April 25, 1973. The interest taken is a flowage easement. The measure of damages here is the value of the whole parcel before, less the value of the remaining tract after, considering the erosion that has occurred and will occur, the cost of riprapping for protection, and whatever other elements there may be.
The findings of the court are those incorporated in this opinion.