**SOLAR TURBINES, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 53–88C.

United States Claims Court.

Jan. 31, 1989.

See also 14 Cl.Ct. 551.

Dan Burt, Washington, D.C., for plaintiff.

George M. Beasley, III, with whom were Asst. Atty. Gen. John R. Bolton, and David M. Cohen, Director, Washington, D.C., for defendant. Royanne C. Bailey and Jesse Bendahan, U.S. Naval Sea Systems Command, of counsel.

## OPINION

ANDEWELT, Judge.

In this government contract action filed pursuant to the Contract Disputes Act (CDA), 41 U.S.C. § 601, *et seq.*, plaintiff, Solar Turbines, Inc. (Solar), seeks review of certain decisions by the Department of the Navy's (the Navy) contracting officer. The action is presently before the court on defendant's motion to dismiss under RUSCC 12(c) alleging lack of subject matter jurisdiction. Because the pleadings are not yet closed, a motion under Rule 12(c) is premature.[1] Defendant's motion, therefore, will be treated as a motion seeking dismissal under RUSCC 12(b)(1) for lack of subject matter jurisdiction and under RUSCC 12(b)(4) for failure to state a claim upon which relief can be granted. For the reasons set forth herein, defendant's motion is denied.

*Facts*[2]

*The RACER Contract*

The contract in dispute relates to the design and production of a Rankine Cycle

---

1. Defendant has not yet filed its answer. Rule 12(c) provides that motions for judgment on the pleadings may be filed "[a]fter pleadings are closed."

2. The facts are derived from the evidence submitted by the parties. In evaluating a motion under Rule 12(b)(1), this court need not assume that all factual allegations in the complaint are true. If the motion involves a factual attack on the jurisdictional allegations in the complaint,

the court may receive competent evidence to resolve the factual dispute. *See, e.g., Land v. Dollar,* 330 U.S. 731, 67 S.Ct. 1009, 91 L.Ed. 1209 (1947); *Beurè-Co. v. United States,* 16 Cl.Ct. 42, 52 (1988). Consequently, when the court informed the parties that it would treat defendant's motion as a motion under Rule 12(b)(1), it indicated that the parties could submit any additional evidence they deemed appropriate.

Energy Recovery (RACER) System for use on Navy vessels. The RACER system is intended to improve the fuel efficiency of vehicles that employ large gas turbine engines by using waste heat recovered from gas turbine engines to drive a steam turbine.

As originally awarded on September 30, 1981, the contract, No. N00024–81–C–5340 (the RACER contract), was limited to the preliminary design of a RACER system. The contract was subsequently modified, however, to provide for the full-scale engineering design, building, and testing of RACER prototypes.

Congress and the Navy placed RACER on an accelerated development schedule and decided to use RACER on the new Burke class guided missile destroyer (the DDG–51 class) then being designed. For Fiscal Year (FY) 1984, Congress authorized the Navy to spend approximately $40 million for RACER, $24 million over the Navy's request, and specified that $24 million be directed "to ensure compatibility of the RACER system with all ships in the DDG–51 class, including the lead [*i.e.*, first] ship." However, despite the authorization, the Navy allegedly spent only $9 million in FY 1984 for RACER.

For FY 1985, Congress, again exceeding the Navy's request, authorized $45 million in response to the Navy's request for approximately $24 million. Congress required that the Navy spend the $45 million "only for continued development of the [RACER] system to ensure compatibility of the RACER system with all ships in the DDG–51 class, including the lead ship." In addition, Congress prohibited the Navy from obligating or spending any of the $1.1739 billion Congress authorized to build the DDG–51 class in FY 1985 "until the Secretary of the Navy certifie[d] to [Congress] that the lead ship in that program is capable of being equipped with a [RACER] system without rearrangement of ship spaces and equipment or other major modification to the ship." The Secretary of the Navy so notified Congress on December 21, 1984.

By October 19, 1984, Solar's contract had been modified a total of 34 times. The numerous modifications and changes in the contract scope increased Solar's total estimated cost for completing contract development of RACER from approximately $34.2 million in 1982 to approximately $62.5 million as of November 1984.

On January 3, 1985, Solar and the Navy entered into a Memorandum of Understanding (MOU) to convert the existing cost-plus-award fee contract into a cost-reimbursable type contract having a $55 million limitation on Navy liability. The MOU provided that Solar would design, fabricate, test, and deliver three RACER units of specified characteristics. In the event that Solar's costs and fees reached the $55 million cap, Solar had two options. First, Solar had the unconditional right to require the Navy to terminate the contract for convenience and thereby eliminate any further obligation to develop, test, or deliver RACER. Second, in the alternative, Solar could elect to complete RACER at its own cost. The MOU was incorporated in the contract through General Contract Modification P00037 (P00037) on April 19, 1985. In addition to incorporating the MOU, P00037 provided the Navy with an unpriced option to have Solar design and manufacture two additional RACER units (units 4 and 5).

Solar continued work on RACER after P00037 went into effect, and ultimately received $55 million in payments. In early 1986, Solar requested additional funds to cover costs it had allegedly expended above $55 million. The parties held negotiations during April 1986, and on April 24, a senior Solar official and a Navy officer agreed to and initialed a "Proposed Mutual Termination Modification" (PMTM).

The PMTM provided that Solar would cease all contract work "as of the effective date of this contract modification," except preparation of a settlement proposal under the termination clause of the contract. That settlement proposal could include, *inter alia*, costs incurred both prior and sub-

Where the facts in the complaint are not dis-   puted by defendant, they are presumed true.

sequent to the effective date of P00037. Payment of these costs would not be barred by the $55 million cap if the costs were found otherwise valid either by the contracting officer or under the disputes procedures in the RACER contract.

The PMTM apparently was not incorporated into the RACER contract by a contract modification. On May 8, 1986, the Navy's Procurement Contracting Officer (PCO) unilaterally terminated the contract for convenience of the government. Notwithstanding the PMTM, under the heading "Government Liability," the termination letter provides: "Pursuant to Clause H–20 'Ceiling Amount,' which was added to the contract by Modification P00037, the Government's total liability under the contract, including its liability in the event of a termination, shall not exceed $55 million." Thereafter, on June 2, 1986, the Secretary of the Navy informed the House Armed Services Committee that "by mutual consent, the Navy and Solar terminated the RACER development Contract on 8 May [1986]."

*Solar Files a Claim Seeking Additional Payment*

In a November 14, 1986, letter to the Termination Contracting Officer (TCO), Solar requested payments from the Navy above the $55 million it had already received. The letter is 16 pages long and the attachments, including a memorandum of points and authorities, exceed 300 pages.

In its letter, Solar purported to present a "termination settlement proposal" of $66,-505,878 ($11,505,878 above the $55 million it had already received), which covered "termination for convenience costs together with profit to the date of termination, as well as associated settlement expenses." In the course of the letter, Solar also requested $22,120,000 in addition to the $66,-505,878 to cover "anticipated profit on production." Solar explained that "the termination constituted a breach of contract." Accordingly, Solar included the "anticipated fees (profit) which it would have earned

had the Navy honored rather than breached its contract." Solar took the position that payments in excess of the $55 million cap were appropriate because modification P00037 was invalid.

In the memorandum of points and authorities, Solar detailed the factual and legal basis for its request, including the basis for its breach of contract allegation and its allegation that P00037 was invalid. Solar alleged, in effect, that the Navy had determined not to use the RACER system on the DDG–51 class vessels but did not disclose this information to Solar. Instead, Solar argued, the Navy fraudulently induced Solar to accept the $55 million cap and then to spend in excess of the cap by representing that the Navy would procure 21 RACER production systems, would award Solar the options for units 4 and 5, and would not terminate the contract for convenience.

In the penultimate paragraph of the letter, Solar, in effect, asked that its payment request be treated as a "claim" under the CDA. The letter states:

> This claim is submitted pursuant to the Contract Disputes Act of 1978, 41 U.S.C. Section 601 et. seq. As a result, you are required to resolve this claim by (1) paying it, (2) issuing a final decision denying it, or (3) establishing a reasonable schedule for processing it within 60 days of the date of claim submission.

Enclosed with the letter was the certification required under the CDA for claims above $50,000.

The TCO responded to Solar's request for payment in a January 13, 1987, letter. The TCO took the position that Solar's submission was not a "claim" under the CDA because it was a "routine request for payment that [was] not in dispute when submitted." In addition, the TCO indicated that the references in the letter to a potential breach of contract suit left Solar's intent unclear. He asked Solar, in effect, to choose between negotiating a termination settlement and pursuing the alleged breach of contract.[3]

---

**3.** The TCO stated:

Solar Turbines' pursuance of a contract breach suit would be beyond the authority of

the [TCO] and would obviate negotiation of a termination settlement. Therefore, please either notify me that Solar Turbines is pursuing

In a January 20, 1987, response, Solar declined to choose between negotiating a termination settlement and pursuing the alleged breach of contract. Solar took the position that its termination for convenience claim for $11,505,878 was a "claim" under the applicable regulations, and contended that "[i]f it were undisputed, [the Navy] would have paid it promptly like any other invoice within the customary 30 days." In addition, Solar explained its breach claim in greater detail, stating:

The claims package in your possession also contains a breach claim which is alternative to the termination claim. That [breach] claim is in the full amount of $33,625,878.00. It consists of (1) the company's costs to the date of termination together with a reasonable profit thereon, (2) the costs of settling with subcontractors, and (3) anticipatory profits. This claim is predicated on a breach of contract by the Navy and contends that the Navy's termination was a breach of Modification P00037 if it is valid, and a breach of the 24 April 1986 mutual termination agreement whether or not Modification P00037 is valid.

The principal difference between the termination and breach claims is the element of anticipated profit. The cost, fee to the date of termination, and settlement expense elements of the breach claim can and should be computed under the FAR and the termination for convenience principles.[4]

In his response of January 26, 1987, which was in excess of 60 days after receipt of Solar's November 14, 1986, submission, the TCO did not mention Solar's allegation of breach of contract. The TCO reiterated, however, his position that there was not yet any dispute. The TCO stated that "[i]f Solar Turbines and the TCO cannot reach an agreed upon settlement, the TCO will then issue a final decision from

which Solar Turbines may appeal.... Prior to such failure to agree and subsequent final decision no dispute exists."

Not satisfied with the TCO's response, on February 1, 1987, Solar filed a petition with the Armed Services Board of Contract Appeals (the Board or ASBCA) and requested that the Navy be ordered to provide:

(1) [a] final decision on entitlement with respect to applicant's termination for convenience and alternative breach of contract claims not later than 15 March 1987 and (2) a final decision with respect to quantum on those claims not later than 1 October 1987.

In an order dated February 11, 1987, the Board directed the Navy to furnish Solar within 21 days either a final decision or a statement as to when the contracting officer would issue a decision. In its response to the order, the Navy distinguished between two purported "claims" by Solar— the first a termination settlement proposal seeking $11,505,878 in costs and fees above the $55 million already paid, and the second an alternative breach of contract allegation seeking the same $11,505,878 plus $22,120,-000 in anticipatory profits, for a net claim of $33,625,878. The Navy took the position that the first purported "claim" did not constitute a claim under the CDA because there was not yet the required dispute between the parties as to the payment of the money requested. The details of the Navy's explanations are explained *infra*. The Navy further indicated that the processing of Solar's termination settlement proposal was complex and, with Solar's cooperation, could be expected to be completed by November 30, 1988.

Turning to the breach of contract allegation, the Navy did not dispute that this second "claim" presented by Solar constituted a proper "claim" under the CDA. The Navy indicated that it would issue a

---

a contract breach suit and withdraw your termination settlement proposal or remove any reservations or qualifications on your submission of this termination settlement proposal.

**4.** In the letter, Solar also alleged that the Navy's failure to act on Solar's November 14, 1986,

submission was itself a final decision denying the claims, but that Solar would withhold any legal action until January 30, 1987, to give the contracting officer an opportunity to issue a final decision.

final decision on that aspect of the request by March 25, 1987.

On March 25, 1987, the contracting officer issued a decision. The decision characterizes Solar's request as resting on "two alternative theories of recovery." The first "theory" corresponds to the first purported "claim" discussed in the Navy's filing with the Board, *i.e.*, Solar's request under the contract termination clause for $11,505,878 above the $55 million it had already received. The contracting officer, referring to the reasoning set forth in the government's response to the ASBCA's order of February 11, 1987, concludes that this request is not a "claim" under the CDA.

The contracting officer then describes Solar's second theory, as follows:

> Solar's second, alternative, basis for recovery is that the Navy's failure to exercise an option for the production of RACER units 4 and 5 along with the Navy's termination of the contract amounted to a breach of the contract. Solar seeks payment of the same $11,505,878 described above plus $22,120,000 in alleged anticipated profits on production of RACER units 4 through 21.

The contracting officer treated this breach of contract claim as a proper claim under the CDA, but denied the claim on the ground that there had been no breach of contract. The contracting officer stated:

> The Navy denies making any misrepresentations to Solar regarding the future production of RACER units and in particular denies that Solar was promised that it would be awarded option units 4 and 5. The only promises between the parties were those contained in the contract, as modified by P00037, and the contract clearly did not contain any Navy obligation to award units 4 and 5 to Solar. Absent such an obligation, the Navy's failure to make such an award could not

and did not amount to a breach of contract.

> Moreover, there was no implied obligation not to terminate the contract.

In denying this claim, the contracting officer did not distinguish between the $11.5 million portion of plaintiff's purported breach of contract claim that relates to costs, fees, and subcontractor settlements, and the $22 million portion that relates to anticipatory profits. The contracting officer stated that "[t]he Navy did not breach the contract and Solar's breach of contract claim is hereby denied in its entirety."

Thereafter, Solar advised the Board that no further action was necessary on its petition, and the Board dismissed Solar's petition as moot.[5]

*Solar's Complaint*

Solar filed this action on January 22, 1988. The complaint requests review of the TCO's March 25, 1987, final decision and seeks payment of approximately $10 million in unpaid costs and fees, which corresponds to Solar's request to the contracting officer for $11,505,878, and approximately $22 million in lost profits on future contracts.

The complaint contains eight counts. Each of the eight counts presents a different legal theory for recovery of the approximately $10 million in costs and fees. In addition, count 8 seeks anticipatory profits on future RACER contracts. The counts allege, *inter alia*, failure to disclose superior knowledge, breach of contract, breach of warranty, inequitable conduct, and failure to make payments due under the contract's termination for convenience clause. The counts focus primarily on the allegedly fraudulent acts by the Navy that are described in Solar's November 14, 1986, request for payment, including allegedly

---

**5.** In a letter to the Board, Solar stated that it had received the final decision of the contracting officer with respect to the breach claim and advised the Board that it need take no further action on that portion of its petition. Solar further stated that while it disagreed with the government's position that a certified termination settlement proposal is not a CDA claim, the contracting officer's final decision addressed both the invalidity of P00037, "which is the presently disputed element of the termination claim," as well as the breach claim itself. Solar concluded that the contracting officer had in substance taken the action requested in Solar's petition—he provided a final decision on entitlement with respect to Solar's termination for convenience and alternative breach of contract claims.

false representations by Navy officials concerning the Navy's intent to use the RACER system on the DDG–51 class vessels.

## Discussion

### I.

Defendant seeks dismissal of both categories of damages alleged in the complaint —the request for approximately $10 million in costs and fees and the request for approximately $22 million in anticipated profits on future contracts. With respect to the request for approximately $10 million in costs and fees, defendant contends that two prerequisites to this court's jurisdiction under the CDA are absent: (1) a certified written "claim" by the contractor to the contracting officer covering the $10 million (41 U.S.C. § 605(a)); and (2) a decision by the contracting officer on the claim (41 U.S.C. § 605(c)). With respect to the request for approximately $22 million in anticipated profits on future contracts, defendant contends, in effect, that the complaint does not state a claim over which this court has jurisdiction because plaintiff does not allege that a binding contract existed obliging the Navy to enter any future contracts.

### II.

■ There is no dispute that Solar's November 14, 1986, letter seeking damages for breach of contract constitutes a "claim" under the CDA. In addition, there is no dispute that the contracting officer issued a decision denying that claim. Defendant's argument that there is no "claim" and no contracting officer "decision" covering the complaint request for approximately $10 million in costs and fees therefore amounts to a contention that the breach claim and the decision on that claim were limited to Solar's request for $22 million in anticipatory profits and did not also encompass Solar's request for $11.5 million in costs and fees. But the facts demonstrate to the contrary.

First, Solar's perception of the scope of its breach of contract claim is unambiguous. As described above, in its January 20, 1987, letter, Solar explained that it sought total damages under its breach theory of $33,625,878, consisting of $22,120,000 in anticipatory profits and also $11,505,878 in costs and fees. Thus, Solar made clear that it viewed its termination and breach theories as alternative theories for recovery of the $11,505,878 in costs and fees.

The Navy had the same perception when it denied the claim. In its argument, defendant focuses on the Navy's refusal to award costs and fees under Solar's alternative termination for convenience theory. As explained above, the Navy refused to issue a decision on its liability under that theory. The Navy concluded that Solar's November 14, 1986, letter did not present a CDA "claim" under that theory but merely constituted a routine request for payment under the contract that was not yet in dispute. But the Navy's refusal to treat Solar's request for costs and fees under a termination for convenience theory as a claim does not mean that the Navy did not consider costs and fees to be part of Solar's alternative breach claim. To the contrary, as described above, in both its filing with the Board and again in the contracting officer's final decision, the Navy indicated that it viewed the breach of contract allegation as encompassing the request for $11,505,878 in costs and fees. Indeed, in his March 25, 1987, decision, the contracting officer described the breach of contract allegation as "Solar's second, *alternative* basis for recovery" (emphasis added) in which "Solar seeks payment of ... $11,505,878 ... plus $22,120,000." The contracting officer then proceeded to deny the claim "in its entirety," apparently referring to these two monetary parts of plaintiff's request for payment under a breach of contract theory.

The conclusion that both sets of damages were encompassed in the breach claim is consistent with the relevant law of damages. A prevailing party in a breach of contract suit is entitled to compensatory damages that approximate performance of the contract. *Miller v. Robertson*, 266 U.S. 243, 257, 45 S.Ct. 73, 78, 69 L.Ed. 265 (1924). Under Solar's breach of contract theory, the $55 million cap would not be

enforceable because Solar was fraudulently induced to agree to it. Hence, the damages that would approximate performance of the RACER contract would include the costs and fees that, absent the $55 million cap, would be due under the contract.[6]

Hence, contrary to defendant's allegations, the two pertinent CDA jurisdictional requirements are present with respect to plaintiff's request for approximately $10 million in costs and fees based on a breach of contract theory. Solar filed a claim demanding such funds on that theory and the contracting officer denied the claim.

### III.

This result leads to the question of whether this court also has jurisdiction to hear plaintiff's alternative theory for recovery of its costs and fees, which seeks payment under the contract pursuant to the contract's termination for convenience clause. As explained above, the contracting officer did not treat the request for payment under this theory as a CDA "claim" and refused to issue a "final decision" on it.

The CDA does not contain a definition of the term "claim." The Contract Disputes Clause incorporated in the RACER contract, however, does define the term.[7] It provides, in pertinent part:

> (c)(1) As used herein, 'claim' means a written demand or assertion by one of the parties, seeking as a matter of right, the payment of money, adjustment, or interpretation of contract terms, or other relief, arising under or relating to this contract. However, a written demand by the Contractor seeking the payment of money in excess of $50,000 is not a claim until certified....

(2) A voucher, invoice, or other routine request for payment that is not in dispute when submitted is not a claim for the purposes of this Act. However, where such submission is subsequently disputed either as to liability or amount or not acted upon in a reasonable time, it may be converted to a claim pursuant to the Act by complying with the submission and certification requirements of this clause.

A strong argument can be made that Solar's presentation of two alternative theories for recovery of the same costs and fees constitute, in effect, a single CDA "claim." In its November 14, 1986, letter, Solar referred to its request in the singular as a "claim." Moreover, both theories rely essentially on the same allegedly fraudulent acts by the Navy to support a conclusion that the $55 million cap is not enforceable, and, hence, that the costs and fees are recoverable. *See Cerberonics, Inc. v. United States*, 13 Cl.Ct. 415, 417 (1987); *J.F. Shea Co. v. United States*, 4 Cl.Ct. 46, 54–55 (1983) (both suggesting that a claim is defined by the set of operative facts underlying it). Plaintiff alleges, in effect, that even if the acts in issue did not constitute a breach of contract, they were sufficiently egregious to estop defendant from relying on the $55 million cap in a suit under the termination for convenience provision of the contract.

But, in any event, even if Solar's presentation of two alternative theories is viewed as the presentation of two separate, alternative claims, this court would also have jurisdiction over the "second" claim seeking costs and fees under the contract's termination clause. As explained in IV, contrary to the contracting officer's decision, Solar's request for funds under a

---

**6.** Defendant appears to contend that upon termination of the contract, the issue of costs and fees was within the exclusive authority of the TCO and no longer within the authority of the PCO. Therefore, defendant argues, the PCO did not have authority to cover costs and fees in the PCO's March 25, 1987, decision. But the regulations that defendant relies upon simply do not support this position. FAR 49.101(d) provides only that the TCO is "responsible for negotiating any settlement with the contractor" and "shall promptly schedule and complete audit reviews

and negotiations." The regulations do not explicitly or implicitly suggest that by delegating this responsibility to the TCO, the PCO divests himself of ultimate authority over termination-related disputes.

**7.** Neither party contends that the definition of the term "claim" in the Contract Disputes Clause is not applicable in defining the term "claim" as used in the CDA.

termination for convenience theory would constitute a "claim" under the CDA. Moreover, as explained in V, the contracting officer's actions and representations were sufficient to constitute the required "decision" on that claim.

## IV.

■ Defendant does not dispute that plaintiff's November 14, 1986, request for payment pursuant to the contract's termination for convenience clause literally falls within the definition of the term "claim" in Section (c)(1) of the Contract Disputes Clause. Defendant contends, however, that the request falls within the narrow exception contained in Section (c)(2) because it constitutes "[a] voucher, invoice or other routine request for payment that [was] not in dispute when submitted."

Plaintiff appears to contend that a certified claim seeking damages under a termination clause could never fall within Section (c)(2) because such a claim cannot be considered a routine request for payment. But it is not necessary for this court to address that broad issue because on the particular facts of this case, plaintiff's request for funds clearly would not qualify under Section (c)(2) as a "routine request for payment that [was] not in dispute when submitted."

This is not a case where a contract was terminated for convenience without any previous discussion and the contractor made a settlement proposal seeking damages pursuant to and due under the specific terms of the contract. Herein, the contract contained a specific provision (P00037) capping the Navy's liability under the contract at $55 million. Solar seeks $11.5 million over the cap on the ground that P00037 was invalid, *inter alia*, because the Navy engaged in a series of misrepresentations and fraudulent acts. Solar and the Navy had discussed Solar's entitlement to payments in excess of the cap prior to the filing of Solar's request, and a Navy representative, by initialling the PMTM, at least tentatively had agreed to reimburse plaintiff for costs and fees above the $55 million cap. But the Navy apparently reversed course and disputed Solar's entitlement to payments over the cap when, instead of proceeding under the procedures anticipated by the PMTM, the Navy unilaterally terminated the contract. The Navy stated in its termination letter that pursuant to P00037, "the Government's total liability" under the contract, including its liability in the event of a termination, "shall not exceed $55 million." In the context of these facts, plaintiff's request when submitted was neither "routine" nor "undisputed."

To support its argument to the contrary, defendant relies on the Navy's subsequent responses to Solar's November 14, 1986, request, primarily the Navy's response to the ASBCA's order of February 11, 1987. While the proper focus under Section (c)(2) of the Contract Disputes Clause is whether the claim was "routine" and "not in dispute" at the time it was "submitted," post-submission actions potentially can be helpful in making that determination.

In its response to the ASBCA's order, the Navy explained its rationale for concluding that Solar's request did not constitute a CDA claim. It took the position that the request was "essentially a termination settlement proposal" and that:

[t]he mere submission of a termination settlement proposal does not constitute a claim [under the Contract Disputes Act]. *Mayfair Construction, Inc.*, ASBCA No. 30,800, [87–1 BCA ¶ 19,542] (December 23, 1986). Rather, a claim arises only when a dispute for a sum certain exists between the parties. The Contracting Officer must issue a final decision only when such a dispute exists. Raising potential entitlement issues does not amount to a claim.

In this case, although Solar has asked for a final decision on the validity of Modification P00037, no dispute exists on the termination submittal, including the validity of Modification P00037, because the TCO has not yet completed his evaluation of the termination settlement proposal and disallowed some of the claimed costs. It is at present unknown whether the allowable costs will exceed the $55,-000,000 contract ceiling imposed by

P00037. *Unless and until the TCO determines that Solar's costs do exceed that limitation, no dispute will exist regarding Modification P00037.*

(Emphasis added.)

But this statement is at best ambiguous as to whether, even at the time the statement was made, the Navy was indicating any flexibility with respect to making payments above the cap. It can be argued that the Navy therein was indicating that it had not yet decided whether to make payments above the cap. On the other hand, another possible interpretation is that the Navy found no dispute only because Solar had not yet demonstrated that its costs and fees exceeded the $55 million advanced during the term of the contract, *i.e.*, that once such a showing was made that actual costs and fees exceeded $55 million, a dispute would exist because the Navy had already decided not to make payments above the cap. But, if the Navy had in fact decided not to make payments above the cap, a dispute certainly would exist. Solar had already received $55 million in advanced payments and requested $11.5 million more. If the Navy had decided that it would give no more, the request for an additional $11.5 million clearly would be "in dispute."

Other conduct subsequent to Solar's November 14, 1986, request for payment supports the interpretation that the Navy had decided not to make payments above the cap. For example, in his deposition testimony, the TCO stated that he did not believe that he had authority to settle the termination claim for in excess of the $55 million cap and, in addition, did not dispute that he had told Solar's counsel that "there was not a snowball's chance in hell of Solar

recovering any amount in excess of $55 million." [8] Support for this interpretation also is found in the contracting officer's decision denying Solar's breach of contract claim. Both the breach and the termination for convenience allegations were supported by a single recitation of facts alleging misrepresentations and fraudulent behavior by the Navy. In his final decision, the contracting officer issued a fairly broad denial of the allegations and stated that "[t]he Navy denies making any misrepresentations to Solar regarding the future production of RACER units," that "[t]he only promises between the parties were those contained in the contract as modified by P00037," and that there was no implied obligation not to terminate the contract. By suggesting that the Navy had not engaged in any improper conduct, the contracting officer at least implied that the Navy viewed P00037, with its $55 million cap, as valid and enforceable.

Neither *Mayfair Construction Co. v. United States,* 841 F.2d 1576 (Fed.Cir. 1988), *cert. denied,* — U.S. —, 109 S.Ct. 528, 102 L.Ed.2d 560 (1988), which was cited by the Navy both in its response to the ASBCA's order and in its brief, nor *Gardner Machinery Corp. v. United States,* 14 Cl.Ct. 286 (1988), also cited in defendant's brief, suggests a different result. In each case, a settlement proposal involving a contract that had been terminated for convenience was held not to constitute a CDA "claim." But both cases are distinguishable on a number of grounds. For example, in neither case was there substantial evidence of a dispute as to payment prior to the submission of the termination settlement proposal. *Mayfair,* 841 F.2d at 1578; *Gardner,* 14 Cl.Ct. at 293.[9]

---

**8.** In addition, notes were prepared by Navy personnel of a July 1, 1986, discussion in which Solar indicated to the TCO that Solar would seek substantial, unadjusted contract claims that would bring total costs and fees to in excess of $55 million. In the notes, under the heading "CONTRACT VALUE" is the notation "Funding Limitation $55,000,000," and under the heading "CLAIM" is the notation "[greater than] $55,000,000." After these discussions, the TCO requested that the PCO modify Solar's contract to permit the Navy to pay Solar $250,000 to cover settlement expenses. The PCO refused. Notes

of that conversation state: "Contract capped at $55 million.... No additional money is going to be added to this contract unless something drastically happens to change the situation. Navy is reluctant to add anything to this contract at this time."

**9.** In addition, in *Mayfair,* the contract at issue contained a different Contract Disputes Clause that used a narrower definition of the term "claim" than the Contract Disputes Clause contained in Solar's contract. 841 F.2d at 1577. To constitute a "claim" under the CDA in *Mayfair,* a

In sum, when the available evidence is viewed in its entirety, Solar's request for payment under the contract's termination for convenience clause does not fall within Section (c)(2) of the applicable Contract Disputes Clause because it was not a "routine request for payment that [was] not in dispute when submitted." Hence, the request constituted a CDA "claim."

## V.

◼ Defendant contends that even if Solar's request for payment under the termination for convenience clause is deemed a CDA "claim," a separate statutory prerequisite to this court's jurisdiction over that claim is absent—a decision by the contracting officer on that claim. Defendant points to the contracting officer's refusal to issue the requested "final decision" on the $11.5 million request under the termination for convenience theory and his refusal to issue a "final decision" specifically on the validity of P00037, which contains the $55 million cap. But as described above, while the Navy purportedly refused to issue a "final decision," its explanation permits the interpretation that it had decided not to make any payments in excess of the $55 million cap. As explained above, any such decision not to make any payments above the cap would constitute a decision denying Solar's termination claim since Solar had already received $55 million and, if the cap were enforced, it would not receive any of the additional money requested.

◼ In any event, however, even if the contracting officer's written statements are not interpreted as a decision on the contract termination claim, a decision should be "deemed" to have been made on that

claim pursuant to 41 U.S.C. § 605(c)(5), which provides, in pertinent part:

Any failure by the contracting officer to issue a decision on a contract claim within the period required will be deemed to be a decision by the contracting officer denying the claim and will authorize the commencement of the appeal or suit on the claim as otherwise provided in this chapter.

In applying Section 605(c)(5), three pertinent "period[s] required" are set forth respectively in Section 605(c)(2), (c)(3), and (c)(4). These subsections provide:

(2) A contracting officer shall, within sixty days of receipt of a submitted certified claim over $50,000—

(A) issue a decision; or

(B) notify the contractor of the time within which a decision will be issued.

(3) The decision of a contracting officer on submitted claims shall be issued within a reasonable time, in accordance with regulations promulgated by the agency, taking into account such factors as the size and complexity of the claim and the adequacy of the information in support of the claim provided by the contractor.

(4) A contractor may request the agency board of contract appeals to direct a contracting officer to issue a decision in a specified period of time, as determined by the board, in the event of undue delay on the part of the contracting officer.

Herein, a "deemed" decision would result under both 605(c)(2) and (c)(3). As to subsection (c)(2), the contracting officer did not within 60 days of receipt of the claim either issue a decision or notify the contractor as to when a decision would be issued. (The

request had to either be in dispute or remain unresolved after a reasonable time for government review and disposition. The Solar clause, however, classifies as a claim all nonroutine requests for payment regardless of whether they are in dispute or unresolved for a reasonable time. With respect to *Gardner,* the court indicated that the issue of whether a request for funds is a "claim" under the CDA should be evaluated on a case-by-case basis based on the particular facts involved. 14 Cl.Ct. at 290. The court found that the contractor's settlement proposal did not constitute a "claim" therein be-

cause the proposal was made for the purpose of negotiating a settlement agreement rather than for the purpose of making a finite demand for a finite amount of money from the contracting officer. The court stressed that "[n]owhere in these submissions can one find the requisite demand for that finite amount nor the request for a final decision." *Id.* at 293. In the case at bar, however, the contractor sought a finite amount of money that was in dispute at the time of the submission, requested a final decision, and indicated, in effect, that it wanted its request treated as a "claim."

contracting officer's statement to the effect that it would take until November 1988 to make a determination on Solar's termination settlement proposal was made in excess of 60 days after the claim was received.) Moreover, even if for some reason subsection (c)(2) were not deemed determinative, the contracting officer failed to issue a decision within a reasonable time as required in subsection (c)(3).

With respect to subsection (c)(3), defendant contends that a reasonable time had not yet passed because the contracting officer was waiting for Solar to provide pertinent financial information in support of its settlement proposal, including complete inventory schedules, a proposal for equitable distribution of termination inventory, and a "percentage of completion" proposal. But the Navy did not need the requested information to reach a decision as to the enforceability of the $55 million cap. That issue turned on the alleged misrepresentations and fraudulent behavior by the Navy, and the Navy did not request any additional information concerning those allegations. Indeed, as noted above, the contracting officer, employing language that suggested the Navy had done nothing wrong, evaluated these allegations and denied that they indicated a breach. It should not have taken any significant additional time to determine whether the facts, while not demonstrating a breach, would for some other reason render the cap unenforceable. If the Navy was going to enforce the cap, plaintiff's claim for $11.5 million over the cap would have been denied in its entirety regardless of what the additional financial data demonstrated. Solar was entitled to such a decision on its claim within a reasonable time and did not receive it.

■ Defendant contends that, in any event, the court should not find a "deemed decision" under either Section 605(c)(2) or (c)(3) for two related reasons. First, defendant, in effect, interprets Section 605 of the CDA as providing two separate and distinct remedies available to a contractor for a contracting officer's failure to issue a decision within the time limit set forth in either subsection (c)(2) or (c)(3)—either (1) seek review of the deemed decision by filing suit in this court or an appeal with the agency board of contract appeals; or (2) petition the agency board under 605(c)(4) to require a contracting officer's decision within a specified period of time. Defendant argues that plaintiff selected the second route and, having made this selection, there would be no "deemed decision" until defendant failed to issue a decision in the time specified by the Board. Since the agency never specified a time, defendant argues, there could be no "deemed decision."

But, contrary to defendant's reading, Section 605 does not provide that a contractor's decision to employ the procedures of subsection (c)(4) constitutes such a binding election. As noted above, under the statutory scheme, a "deemed decision" can result from a failure to issue a decision within the time period set forth in either subsection (c)(2), (c)(3), or (c)(4). Nothing in the statute or the case law interpreting it prohibits a contractor from initially filing a motion with the agency board under subsection (c)(4), withdrawing its motion prior to the Board's ordering of a decision by a specified date, and then relying on a time period set forth in either subsection (c)(2) or (c)(3) as the basis for bringing suit in this court.[10]

■ Defendant's related second argument is that the parties continued discussions concerning Solar's request for payment up until the time this suit was filed, and that this "pattern of communication" indicates that Solar had "participated in" the contracting officer's proposed timing for a decision. But the communications do not indicate any explicit agreement by Solar to waive any rights under Section 605(c), nor do they constitute grounds for estoppel. Moreover, courts should be hesi-

---

10. The government suggests that its interpretation of the statute is supported by *Marlin Associates, Inc.*, GSBCA No. 5663, 80-1 BCA ¶ 14,295 (1980) (modified on other grounds, 82-1 BCA ¶ 15,739 (1982)). But *Marlin* does not suggest that the filing of a motion under Section 605(c)(4) alone eliminates the contractor's right to rely on the reasonable time provisions of Section 605(c)(2) or (c)(3).

tant to invoke such interpretations. Communications that possibly can lead to the settlement of a dispute should be encouraged. Such communications would be discouraged, however, if by continuing communications the contractor risked losing the right that it otherwise possessed to file suit in this court.

Thus, for the reasons set forth above, this court has jurisdiction over Solar's alternative theory for recovery of costs and fees which seeks damages under the contract's termination for convenience clause.

## VI.

Next, defendant seeks dismissal of the complaint request for $22 million in lost profits from future contracts covering RACER units 4 through 21.[11] Defendant contends, in effect, that a binding contract covering those future units is a prerequisite to this court's jurisdiction over such a claim and that the complaint fails to state a claim upon which relief can be granted because plaintiff fails specifically to allege such a binding contract.

■ When, as here alleged, a termination for convenience is the product of fraud or deceit, a government contractor is not limited to damages under the termination for convenience provision of the contract but can secure traditional breach of contract damages. *See National Factors, Inc. v. United States*, 204 Ct.Cl. 98, 103, 492 F.2d 1383, 1385 (1974). Such damages include damages that were foreseeable by the parties at the time of the agreement and that were the proximate result of the breach of contract. *Olin Jones Sand Co. v. United States*, 225 Ct.Cl. 741, 742 (1980). *See also, L'Enfant Plaza Properties, Inc. v. United States*, 3 Cl.Ct. 582, 589 (1983), *aff'd and remanded without opinion*, 746 F.2d 1490 (1984). They do not include damages that remotely or consequentially resulted from the breach, *i.e.*, damages that were too remote or speculative to qualify as compensable damages. *Olin Jones*, 225 Ct.Cl. at 742–43.

In evaluating a motion to dismiss for failure to state a claim, the court must presume that all factual allegations in the complaint are true and the complaint generally must be construed liberally, with all reasonable inferences made in favor of the nonmoving party. 2A J. Moore, J. Lucas & G. Grotheer, Jr., *Moore's Federal Practice*, ¶ 12.07 [.2–5] at 12–63 (2d ed. 1987). After so construing the complaint, the court should deny a motion to dismiss for failure to state a claim "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Id.* at 12–65 (quoting *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957)).

Herein, the complaint alleges a breach of contract and that the damages sought were the direct and proximate result of the breach. Moreover, plaintiff alleges in its brief that the government did agree to enter future contracts, and the complaint, liberally construed, arguably can be interpreted so to allege. In addition, at oral argument, plaintiff contended that it can, as a matter of fact, demonstrate the foreseeability of the damages in issue at the time the contract was entered. In this context, the complaint is deemed sufficient to state a claim upon which relief can be granted and, hence, will not be dismissed under Rule 12(b)(4).

■ From the facts that have been presented to date, however, it appears that it may be possible to dispose of the claim for anticipatory profits on summary judgment. First, it is not apparent that plaintiff will be able to demonstrate any binding legal commitment to enter future contracts with the Navy for RACER units 4 through 21. To the extent that plaintiff is relying on the option provision in P00037, that provision applies only to RACER units 4 and 5 and not to units 6 through 21. More fundamentally, however, the option provision in P00037 does not create any legal obligation on the part of the Navy to enter into any future contracts. The option has the effect of binding Solar to provide units 4 and 5 if the Navy chooses to exercise the option; it does not, however, oblige the Navy to exercise the option. *See Dynamics Corp. of America v. United States*, 182 Ct.Cl. 62,

---

11. The complaint does not indicate the nature of the future contracts involved, but plaintiff, at oral argument, indicated that it was referring to units 4 through 21.

74, 389 F.2d 424, 431 (1968). Moreover, apparently no other provision of the RACER contract restricts the government's freedom to decline the exercise of this option. *See Government Systems Advisors v. United States,* 847 F.2d 811, 813 (Fed. Cir.1988).

Second, in the absence of such a binding legal commitment, it appears likely that any damages alleged to result from the unavailability of future contracts would be too remote and speculative to be compensable. In *Olin Jones,* the contractor alleged that the government's failure to make timely payments under the contract prevented it from securing bonding that would have resulted in other profitable contracts. 225 Ct.Cl. at 742. The Court of Claims granted summary judgment to the defendant on this claim. It held that even if the damages could be proven, they would not be available, stating:

> Even if the Government had not delayed contract payments, there is no assurance that plaintiff would have received any contracts, or work.... Receipt or nonreceipt of future contracts is both speculative in nature and dependent on many factors not related to bonding.
>
> [The] damages ... are too remote and indirect to be recoverable....

*Id.* at 744.

.*Olin Jones* differs from the case at bar in certain respects. For example, unlike *Olin Jones,* herein both the allegedly breached contract and the future contracts cover the same products and involve the same government purchaser. Moreover, in the case at bar, a third party, Congress, has direct influence on future Navy procurement decisions, and the facts suggest that Congress may have been more determined than the Navy to continue the RACER program. But, in any event, these fact differences from *Olin Jones* would not appear to warrant any different legal result.

Even assuming Solar's contract was never terminated, a number of circumstances apparently would have had to occur for Solar to have profited from any future contracts. With respect to units 6 through 21, *inter alia,* Solar would have had to develop successfully and test the RACER

system, a decision would have had to be made to procure these additional RACER systems in the context of budgetary restraints and alternative competing uses for the funds, and, since the procurement for the future contracts would have been conducted on a competitive basis, Solar would have had to prevail in the bidding for these future contracts. With respect to RACER units 4 and 5, the same set of circumstances would have had to occur, except that since the Navy had an option on units 4 and 5, competitive bidding would not be necessary if the Navy chose to exercise the option. In this context, and absent other facts, it would appear that at the time of the agreement, profits from these future contracts would be speculative and remote rather than foreseeable and direct and, hence, could not be awarded.

Thus, while the complaint is sufficient to state a cause of action for anticipatory profits relating to future contracts, it is not apparent that plaintiff could survive summary judgment on this claim. But it is premature to confront the issue of summary judgment. Defendant's pending motion was not filed pursuant to RUSCC 56 and did not oblige Solar to set forth any facts supporting its contention that the damages sought are both foreseeable and the proximate result of the alleged breach. If defendant chooses to pursue summary judgment at this time, it should file a motion seeking summary judgment along with proposed findings of uncontroverted fact as required in Rule 56(d)(1). In view of the briefs filed to date, defendant may, but need not, file a brief supporting its motion at that time. Thereafter, plaintiff's response and defendant's reply should be filed according to the applicable Rules of this court.

### Conclusion

For the reasons set forth above, defendant's motion to dismiss filed pursuant to Rule 12(b)(1) and Rule 12(b)(4) is denied.

IT IS SO ORDERED.