**T.L. ROOF & ASSOCIATES CONSTRUCTION COMPANY, Plaintiff,**

v.

**The UNITED STATES, Defendant,**

**No. 90–538C.**

United States Court of Federal Claims.

July 1, 1993.

---

D. Michael Mandig, Tucson, AZ, for plaintiff.

Ellen M. McElligott, with whom were Asst. Atty. Gen. Stuart M. Gerson, David M. Cohen, Director, and James M. Kinsella, Asst. Director, Washington, DC, for defendant.

## OPINION

ANDEWELT, Judge.

In this government contract action filed pursuant to the Contract Disputes Act, 41 U.S.C. § 601 *et seq.* (CDA), plaintiff, T.L. Roof & Associates Construction Company (T.L. Roof), contracted with the United

States Army Corps of Engineers (the Corps) to construct a two-story Communications Equipment Facility (CEF) at Fort Huachuca, Arizona. Originally, the date for contract completion was April 5, 1989, but as a result of a series of delays and contract modifications, the project was not completed until October 1989. On March 3, 1989, plaintiff filed a claim with the contracting officer seeking recovery of plaintiff's costs related to the delay in completing the contract work and to the purchase of material for the "raised-floor system" in the "tempest" area of the CEF. On April 6, 1990, plaintiff submitted a revised claim to the contracting officer. John B. Sneed, one of plaintiff's two area vice presidents, signed and certified both claims. The contracting officer did not issue a final decision on the revised claim within the time periods set forth in 41 U.S.C. § 605(c), and thus, as authorized thereunder, plaintiff filed the instant action on June 15, 1990. In its complaint, plaintiff seeks an estimated $1.6 million plus interest to cover "delay and disruption damages" that resulted from alleged "acts and omissions" by defendant.

Plaintiff filed a motion for partial summary judgment and defendant responded with a motion to dismiss for lack of jurisdiction or, in the alternative, for partial summary judgment. After oral argument, the court ruled from the bench on certain issues and in a December 15, 1992, order, stated certain of the court's conclusions. Herein, the court provides some amplification of its prior conclusions and resolves the remaining issues presented in the parties' motions.[1]

1. In its motion for partial summary judgment, *inter alia*, defendant originally sought summary judgment on plaintiff's requests for attorneys' fees and for lost profits. In its December 15, 1992, order, the court granted defendant's motion on these issues. As the court explained during oral argument, plaintiff's request for attorneys' fees was premature because both a final judgment and a prevailing party are prerequisites for an award of attorneys' fees under 28 U.S.C. § 2412. As to lost profits, the damages plaintiff sought were remote, speculative, and unforeseeable to the parties when the parties entered the contract. *Olin Jones Sand Co. v. United States,* 225 Ct.Cl. 741, 742, 1980 WL

## I.

Under the CDA, this court lacks subject matter jurisdiction over a government contractor's claim in excess of $50,000 if the contractor failed to submit a properly certified claim to the contracting officer before seeking relief in this court. *Ball, Ball & Brosamer, Inc. v. United States,* 878 F.2d 1426, 1428 (Fed.Cir.1989).[2] In its motion to dismiss, defendant contends that plaintiff did not submit a properly certified claim to the contracting officer because Sneed was not qualified to certify the claim under the controlling regulation, Federal Acquisition Regulation (FAR) 33.-207(c)(2), 48 C.F.R. § 33.207. FAR 33.-207(c)(2) provides, in pertinent part:

If the contractor is not an individual, the certification shall be executed by—

(i) A senior company official in charge at the contractor's plant or location involved; or

(ii) An officer or general partner of the contractor having overall responsibility for the conduct of the contractor's affairs.

Plaintiff contends that Sneed satisfies the requirements of FAR 33.207(c)(2)(i). Defendant acknowledges that Sneed was "[a] senior company official" with T.L. Roof, but argues that Sneed was not "in charge at the contractor's plant or location involved."

In *United States v. Grumman Aerospace Corp.,* 927 F.2d 575 (Fed.Cir.1991), *cert. denied,* — U.S. ——, 112 S.Ct. 330, 116 L.Ed.2d 270 (1991), the Court of Appeals for the Federal Circuit interpreted FAR 33.207(c)(2)(i) as requiring a certifying

13211 (1980); *Solar Turbines, Inc. v. United States,* 16 Cl.Ct. 304, 317 (1989).

2. Section 605(c)(1) of the CDA provides, in pertinent part:

For claims of more than $50,000, the contractor shall certify that the claim is made in good faith, that the supporting data are accurate and complete to the best of his knowledge and belief, and that the amount requested accurately reflects the contract adjustment for which the contractor believes the government is liable.

senior company official to satisfy two requirements. The "certifying senior company official [must] have ... primary responsibility for the execution of the contract" and the official must have "a physical presence at the location of the primary contract activity." *Id.* at 580. This court concludes that Sneed satisfies both of these requirements.

First, the evidence submitted by the parties, including deposition testimony, establishes that Sneed had primary authority and responsibility within T.L. Roof for execution of the CEF contract. For example, Sneed had authority to execute subcontracts with no dollar limitation, submit and present claims to the contracting officer, and enter contract modifications. Lance Alley, the CEF project manager, did much of the day-to-day work at the construction site (*i.e.*, negotiated (but did not sign) certain of the modification agreements and prepared initial drafts (but did not sign) the two claims submitted to the contracting officer). Alley, however, was not a senior company official, was supervised by Sneed, and needed Sneed's authorization before taking various actions, including submitting a claim to the contracting officer. Sneed exercised his responsibility of managing the CEF contract by supervising Alley both at the job site and in frequent conversations over the telephone.[3] Viewed in its entirety, the evidence submitted supports a conclusion that Sneed had primary responsibility for the execution of the contract.

Second, Sneed also had "a physical presence at the location of the primary contract activity." Between July 1987 and October 1989, Sneed visited the contract site approximately 40–50 times for an estimated two to three hours each visit. Defendant contends that this amount of time is insuf-

ficient to constitute the required "physical presence." There is, however, no requirement in FAR 33.207(c)(2)(i) that the senior official be permanently located at the contract site. *Sun Cal. Inc. v. United States,* 21 Cl.Ct. 31, 34 (1990). FAR 33.207(c)(2)(i) merely requires that the senior official be "in charge at the contractor's plant or location involved." Sneed's physical presence at the contract site was well beyond *de minimis,* and he was physically at the contract site with sufficient frequency and regularity to be "in charge" at the site.

Requiring an official certifying a claim to have a greater physical presence at the contract site would significantly restrict the options available to certain contractors. FAR 33.207(c)(2) generally seeks to provide a contractor with an option to have either of two classes of corporate officials certify the contractor's claims—either the senior company official in charge at the location of primary contract activity, or an officer or general partner with "overall responsibility for the conduct of the contractor's affairs." In certain industries, such as the construction industry involved herein, individuals who can be categorized as senior company officials typically will not be located on a permanent or near-permanent basis at the location of primary contract activity. Therefore, for such industries, interpreting FAR 33.207(c)(2)(i) to require a near-permanent presence at the job site typically would eliminate one of the two certification options and thereby effectively require that the officer or general partner with "overall responsibility for the conduct of the contractor's affairs" certify each and every claim over $50,000. This requirement would place a significant administrative burden on such an officer, especially in cases where a contractor performs a large amount of federal government business.

3. Plaintiff's "Policy and Procedures Manual" explained Sneed's broad responsibilities as area vice president, as follows:
    (1) Surveillance of monthly pay requests;
    (2) Monitoring weekly and monthly cost reports;
    (3) Monitoring accounts payable and accounts receivable on his projects;
    (4) Attending project meetings at least once monthly;
    (5) Hold project manager meetings and attend project superintendent meetings at least once a month;
    (6) Execute all subcontracts and long form purchase orders;
    (7) Recruit and train new young engineering personnel; and
    (8) Execute all owner contract change orders.

Moreover, such a certification requirement, while effectively precluding one option for certification and creating a potentially significant administrative burden, would not significantly further the important policies underlying FAR 33.207(c)(2). In *Grumman*, 927 F.2d at 579, the Federal Circuit explained that the certification requirement was intended to further the important congressional objectives of "trigger[ing] a contractor's potential liability for a fraudulent claim ...," *Skelly & Loy v. United States*, 231 Ct.Cl. 370, 376, 685 F.2d 414, 418 n. 11 (1982), and thereby " 'discourag[ing] the submission of unwarranted contractor claims,' " *Paul E. Lehman, Inc. v. United States*, 230 Ct.Cl. 11, 14, 673 F.2d 352, 354 (1982) (quoting S.Rep. No. 1118, 95th Cong., 2d Sess. 5 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5235, 5239). Certainly, these objectives would be furthered when an individual such as Sneed certifies a contractor's claim. Sneed had significant general corporate responsibility, had direct responsibility for the contract work, including the monitoring of costs and the submission of claims to the contracting officer, and was in charge at the contract site through both his visits to the site and his frequent telephone conversations with the project manager. Indeed, from the government's perspective, Sneed objectively would seem precisely the type of person whom the government would want to certify a claim. As one of two area vice presidents, Sneed had a high-level position within T.L. Roof. In addition, as the corporate official in charge of the contract work with responsibility for monitoring contract costs (*see* n. 3, *supra*), Sneed had actual knowledge of the work performed and the costs incurred.

Because Sneed satisfied the requirements of FAR 33.207(c)(2)(i) and thus was qualified to certify the claim submitted to the contracting officer, the court's December 15, 1992, order denied defendant's mo-

tion to dismiss for lack of proper certification.

## II.

■ In its complaint, plaintiff seeks recovery of costs resulting from alleged government-caused delays and disruption of the contract work. During the course of contract performance, the government issued 48 contract modifications. In its motion for partial summary judgment, defendant seeks judgment with respect to delays and impact costs related to the changed work performed pursuant to 46 of the 48 contract modifications. Each of these 46 modifications was executed bilaterally, described the scope of the changed work to be performed, and contained the following release:

> It is further understood and agreed that this adjustment constitutes compensation in full on behalf of the contractor and its subcontractors and suppliers for all costs and markup directly or indirectly attributable to the change ordered, for all delays related thereto, and for performance of the change within the time frame stated.

Certain of these 46 modifications provided for additional compensation due plaintiff and/or extended the contract completion date through October 2, 1989.

In its motion, defendant contends that under the doctrine of accord and satisfaction,[4] the release provision in these modifications bars plaintiff from presenting any claims relating to the changes ordered in the 46 bilateral modifications, including claims based on delays in completing unchanged work. Plaintiff responds that during the negotiations concerning the modifications and during discussions concerning contract completion, the parties had specifically discussed delay and impact claims and had agreed to defer consideration of these claims until a later time when the costs associated with possible delays could be

---

**4.** The doctrine of accord and satisfaction operates to discharge or terminate an existing right. "Discharge of a claim by accord and satisfaction 'means a discharge by the rendering of some performance different from that which was claimed as due and the acceptance of such sub-

stituted performance by the claimant as full satisfaction of his[/her] claim.' " *Brock & Blevins Co. v. United States*, 170 Ct.Cl. 52, 58, 343 F.2d 951 (1965), *quoting* 6 Arthur L. Corbin, *Corbin on Contracts* § 1276 (1962).

assessed more accurately. Plaintiff presents affidavits, deposition testimony, and documents to support this contention.

The parties disagree as to whether this court should consider such extrinsic evidence concerning the parties' intent in interpreting and applying the release provision contained in the 46 modifications. To support its assertion that the court should consider this extrinsic evidence, plaintiff cites *CYR Constr. Co. v. United States*, 27 Fed.Cl. 153 (1992), and *Commercial Contractors, Inc. v. United States*, 25 Cl.Ct. 666 (1992). In *CYR* and *Commercial Contractors*, the courts examined a release provision identical to the provision involved herein, and each court concluded that to determine the intended scope of the release, "[a]ll circumstances surrounding the negotiations [held prior to the execution of] the modifications need to be examined." *CYR*, 27 Fed.Cl. at 159; *Commercial Contractors*, 25 Cl.Ct. at 670.[5] To support its contrary assertion that the court should not consider plaintiff's extrinsic evidence as to the parties' intent, defendant cites *Craddock v. United States*, 230 Ct.Cl. 991, 1982 WL 25300 (1982). In *Craddock*, the Court of Claims evaluated a release provision identical to the provision involved herein and concluded that the wording of the release is "clear and unambiguous and on its face operates as a bar to all claims not specifically reserved by plaintiff." *Id.* at 994.

*Craddock* is binding precedent on this court and *CYR* and *Commercial Contractors* are not. To resolve the instant summary judgment motion, however, this court need not determine whether *CYR* and *Commercial Contractors* can be reconciled with *Craddock* because the instant action is distinguishable from *Craddock*. In this action, unlike in *Craddock*, plaintiff, in effect, contends that plaintiff's signing of the modifications was the product of a mutual or unilateral mistake or a misrepresentation by defendant. Courts frequently have stated that contract reformation potentially

is available on such grounds. *See, e.g., Timber Investors, Inc. v. United States*, 218 Ct.Cl. 408, 587 F.2d 472 (1978) (misrepresentation); *M.L. Stockton v. United States*, 214 Ct.Cl. 506, 1977 WL 5317 (1977) (unilateral mistake); *Chernick v. United States*, 178 Ct.Cl. 498, 372 F.2d 492 (1967) (unilateral mistake); *National Presto Indus., Inc. v. United States*, 167 Ct.Cl. 749, 338 F.2d 99 (1964) (mutual mistake).

Here, the alleged mistake or misrepresentation involves the legal impact of the contract modifications and specifically, the release provision contained therein. The proper interpretation of a written agreement is an issue of law, *Southwest Welding & Mfg. Co. v. United States*, 179 Ct.Cl. 39, 43, 373 F.2d 982, 985 (1967), and the parties to a contract generally are charged with knowledge of the law affecting their business dealings, *Federal Crop Insur. Corp. v. Merrill*, 332 U.S. 380, 384–85, 68 S.Ct. 1, 3–4, 92 L.Ed. 10 (1947). Consequently, courts have expressed reluctance to reform a contract on the basis of mistake or misrepresentation involving issues of law unless unusual circumstances are present. *Mills v. United States*, 187 Ct.Cl. 696, 700, 410 F.2d 1255, 1257 (1969) ("[i]n the absence of unusual circumstances, representations as to questions of law form no basis for setting aside a contract"); *Aetna Constr. Co. v. United States*, 46 Ct.Cl. 113, 127–28, 1910 WL 919 (1911) ("[a]s a general rule, both at law and in equity, mistakes of law do not furnish ... a ground of relief from the result of acts done in consequence of such mistakes; but when both parties are under a common mistake of law in the use of a certain term or terms in the framing of a written contract, it is the duty of courts ... to afford relief from the consequences of such mutual mistakes of parties in the reduction of their agreements to written form, both as to mistake of law as well as of fact."). *See also Meek v. United States*, 26 Cl.Ct. 1357, 1363 (1992); *C & L*

---

**5.** Additionally, in *CYR* and *Commercial Contractors* the courts stated that "[m]odifications made in the context of on-going contract administration, unless a broader scope is made explicit,

relate to changed work only." *CYR*, 27 Fed.Cl. at 159; *Commercial Contractors*, 25 Cl.Ct. at 670.

*Constr. Co. v. United States,* 6 Cl.Ct. 791, 798 (1984).

Summary judgment is available only if there is an absence of a dispute as to a material issue of fact and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Herein, the evidence presented to date suggests that the bilateral contract modifications may have been the product of mistake or misrepresentation. *Inter alia,* the evidence indicates that (1) plaintiff's negotiators believed they had an agreement with defendant's negotiators that certain delay and impact claims were to be preserved for future resolution, (2) for at least certain of the modifications, not only were defendant's negotiators aware of plaintiff's belief that the determination of delay and impact claims was being postponed, but also defendant's negotiators had the same understanding, (3) during the course of contract performance, the authorized representative for the contracting officer was aware that negotiators for both parties had an understanding to defer discussion of delay and impact claims but he never suggested to plaintiff's negotiators that he had a contrary view of the effect of the modifications, and (5) plaintiff may not have signed the modifications had it believed the modifications would preclude delay and impact claims.

However, as explained above, where an issue of law is involved, a showing of mistake or misrepresentation may not itself be sufficient to justify reformation of a contract. Reformation in such a situation is available only in "unusual circumstances." Herein, the parties' briefs give only selected portions of the underlying facts, and the parties' recitation in their briefs is not sufficiently detailed for the court to determine whether "unusual circumstances" exist so as to warrant reformation of the contract. In this context, the court cannot conclude that there is an absence of a dispute as to a material issue of fact and, therefore, defendant's motion for summary judgment under the doctrine of accord and satisfaction must be denied.

## III.

In plaintiff's motion for partial summary judgment, plaintiff contends that the plans and specifications that defendant drafted for the CEF are deficient and that these deficiencies, combined with defendant's indecision in resolving them, caused delays and disruptions which increased plaintiff's contract completion costs. Plaintiff seeks summary judgment with respect to defendant's liability for increased costs, but does not seek summary judgment as to the amount of such costs.

As a general matter, it is well established that when a contractor is bound to proceed according to government-prepared project plans and specifications, the government bears the financial risk for the consequences of any defects in the plans and specifications. *See, e.g., United States v. Spearin,* 248 U.S. 132, 136, 39 S.Ct. 59, 61, 63 L.Ed. 166 (1918); *Luria Bros. & Co. v. United States,* 177 Ct.Cl. 676, 687, 369 F.2d 701, 707–08 (1966). In other words, design specifications created by the government contain an implied warranty that if the contractor adheres to the specifications, the result will be acceptable to the government. *Blount Bros. Corp. v. United States,* 872 F.2d 1003, 1007 (Fed.Cir.1989); *Stuyvesant Dredging Co. v. United States,* 834 F.2d 1576, 1582 (Fed.Cir.1987); *J.L. Simmons Co. v. United States,* 188 Ct.Cl. 684, 690–91, 412 F.2d 1360 (1969). If the government breaches this implied warranty, the contractor is entitled to recover damages. *Laburnum Constr. Corp. v. United States,* 163 Ct.Cl. 339, 350; 325 F.2d 451, 457–58 (1963).

In the instant action, plaintiff is not entitled to summary judgment because plaintiff simply has not shown that any design deficiency in the plans and specifications caused plaintiff to incur costs over and above those compensated for in the contract and modifications. The primary design deficiency plaintiff cites is the specification requirement that carpet be installed to cover the raised floor in the "tempest" area of the CEF. Plaintiff contends that no carpet was available to satisfy the con-

tract requirements for both grounding and electrical resistivity and that during contract performance, both plaintiff and defendant agreed that the specifications were deficient in this respect. But in its response to plaintiff's motion for partial summary judgment, defendant presents deposition testimony from a carpet salesman who contends that carpets were available that could have satisfied the contract specifications. Moreover, the salesman testified that his company had submitted a bid to plaintiff for installation of a raised-floor system with such a carpet. This testimony is sufficient to demonstrate the existence of a factual dispute as to the adequacy of the carpet specifications.

Plaintiff also argues that the specifications contained other design deficiencies. However, even assuming plaintiff has demonstrated that these deficiencies undisputably existed, summary judgment would not be warranted. To prove liability, in addition to establishing design deficiencies, plaintiff also would have to demonstrate that it suffered increased costs as a result of the defective specifications. *See Spearin,* 248 U.S. at 136, 39 S.Ct. at 61. As explained above, an open question exists as to whether the release provision contained in the 46 bilateral modifications bars plaintiff from seeking any delay and impact damages relating to the changes covered in these modifications. Therefore, for plaintiff to secure summary judgment on the issue of defendant's liability for some, as yet undefined, amount of damages, plaintiff must show that compensable delays occurred independent of and unrelated to these 46 modifications. But the evidence submitted to date is ambiguous as to whether there were any such compensable delays. For example, the 46 modifications extended the contract completion date by 180 days, to and including October 2, 1989. In plaintiff's "critical path analysis" for the CEF, plaintiff's expert states that the contract was "actually completed" on October

2, 1989. This representation leaves it unclear whether plaintiff experienced any delays beyond those accounted for and compensated for in the bilateral modifications. *See John McShain, Inc. v. United States,* 188 Ct.Cl. 830, 835, 412 F.2d 1281, 1284–85 (1969).

One last point warrants note. To the extent plaintiff seeks compensation for these alleged government-caused delays, plaintiff must establish that the delays were in fact the responsibility of defendant. "Where both parties contribute to the delay neither can recover damage[s], unless there is in the proof a clear apportionment of the delay and expense attributable to each party." *Blinderman Constr. Co. v. United States,* 695 F.2d 552, 559 (Fed.Cir.1982), *quoting Coath & Goss, Inc. v. United States,* 101 Ct.Cl. 702, 714–15, 1944 WL 3694 (1944). From the evidence submitted, it appears that certain of plaintiff's actions, particularly with regard to the raised-floor issue, may have caused some delay. For example, once the decision was made to employ tile instead of carpet on the raised floor, plaintiff may have taken an unreasonable amount of time in executing the installation of the tile. For plaintiff to demonstrate its entitlement to any additional payments, plaintiff would have to isolate the delays involved and apportion responsibility appropriately.[6]

### Conclusion

For the reasons set forth above, and consistent with this court's December 15, 1992, order, defendant's motion to dismiss and plaintiff's motion for partial summary judgment are each denied. Defendant's alternative motion for partial summary judgment is granted on the issues of attorneys' fees and consequential damages and is denied in all other respects. On or before August 2, 1993, the parties shall file a status report, jointly or separately, advising the court as to their intentions with

---

**6.** Additionally, plaintiff argues that defendant should be estopped from denying the existence of design deficiencies because defendant had previously conceded that the "overwhelming majority" of the contract modifications resulted

from design deficiencies. But to date, plaintiff has not established the prerequisites for estoppel under *USA Petroleum Corp. v. United States,* 821 F.2d 622, 625 (Fed.Cir.1987).

respect to further proceedings in this action.

IT IS SO ORDERED.